**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| RACHEL SCOTT, derivatively on behalf of THE SCOTTS MIRACLE-GRO COMPANY, | Case No.: 2:24-cv-3636 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| JAMES HAGEDORN, CHRISTOPHER J. HAGEDORN, MATTHEW E. GARTH, DAVID C. EVANS, CORY J. MILLER, BRIAN D. FINN, ADAM HANFT, STEPHEN L. JOHNSON, THOMAS N. KELLY JR., KATHERINE HAGEDORN LITTLEFIELD, NANCY G. MISTRETTA, and GERALD VOLAS, | |
| Defendants, | |
| and | |
| THE SCOTTS MIRACLE-GRO COMPANY, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Rachel Scott ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant The Scotts Miracle-Gro Company ("Scotts" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants James Hagedorn ("Hagedorn"), Christopher J. Hagedorn ("C. Hagedorn"), Matthew E. Garth ("Garth"), David C. Evans ("Evans'), Cory J. Miller ("Miller"), Brian D. Finn ("Finn"), Adam Hanft ("Hanft"), Stephen L. Johnson ("Johnson"), Thomas N. Kelly Jr. ("Kelly"), Katherine Hagedorn Littlefield

("Littlefield"), Nancy G. Mistretta ("Mistretta"), and Gerald Volas ("Volas") (collectively, the "Individual Defendants," and together with Scotts, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Scotts, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Hagedorn, C. Hagedorn, Garth, Evans, and Miller for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Scotts, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 3, 2021 through August 1, 2023, both dates inclusive (the "Relevant Period").

2.      Founded in 1868 by Orlando M. Scott and incorporated in Ohio, Scotts began by selling lawn seed and, since its founding, has been headquartered in Marysville, Ohio. By the mid-1900s, the Company became widely known for its development of lawn fertilizers and grass seeds in the consumer lawn care industry. Since then, Scotts has grown considerably through its

acquisitions of other consumer-focused businesses relating to plant food and weed, pest, and disease control products.

3.       In 1995, Scotts merged with Stern's Miracle-Gro Products, Inc. ("Miracle-Gro"), a company founded in Long Island, New York in 1951 by Horace Hagedorn and Otto Stern that manufactured and sold water-soluble garden plant foods. In connection with the merger, former Miracle-Gro shareholders became shareholders of the newly combined company. As such, Horace Hagedorn's family became significant shareholders of Scotts through their control of the Hagedorn Partnership, L.P. (the "Hagedorn Partnership").[1]

4.       Approximately four years later, in 1999, Scotts acquired the Ortho® brand in the United States ("U.S.") and obtained exclusive rights to market Monsanto's consumer Roundup® brand within the U.S. and other contractually specified countries.

5.       Scotts' business is divided into three segments: U.S. Consumer (which covers the consumer lawn and garden business in the U.S.), Hawthorne (which is a wholly owned subsidiary of Scotts and focuses primarily on hydroponics for the rapidly expanding cannabis industry) and Other (which covers Scotts' consumer lawn and garden business in Canada).

6.       Today, the Company's product portfolio includes Scotts® and Turf Builder® lawn fertilizer and Scotts® grass seed products; Miracle-Gro® soil, plant food and gardening products; Ortho® herbicide and pesticide products; and Tomcat® rodent control and animal repellent products.  Scotts largely sells its products through third-party distributors.

7.       During Relevant Period, the Company was highly leveraged. Indeed, Scotts operated under senior secured credit facilities that featured multiple restrictive covenants and

---

[1] Today, Defendants Hagedorn and Littlefield, along with their brother Robert Hagedorn, sister Susan Hagedorn, and Chief Operating Officer ("COO") of the Company, Nathan E. Baxter, hold approximately 24% of the total voting power of Scotts through their control of the Hagedorn Partnership.

cross-default provisions that required Scotts to retain specific financial ratios. If Scotts breached any of the covenants, the breach could trigger a default, thereby allowing lenders to declare all outstanding indebtedness immediately due and payable.

8.      One of the covenants required Scotts to maintain a debt-to-earnings before interest, taxes, depreciation, and amortization ("EBITDA") ratio under 6.25. To maintain compliance with the EBITDA ratio covenant, Scotts was incentivized to flood its sales networks with inventory. At the beginning of the Relevant Period, the Company had approximately $2.3 billion of debt. BY the  end of the Relevant Period, Scotts' the debt had skyrocketed to $3.1 billion.

9.      In 2020 and 2021, the Company lost out on millions of dollars in sales because of insufficient inventory to meet increasing demand. From this experience, Scotts considerably raised its inventory for both the U.S. Consumer and Hawthorne segments to "ensure [it] could service the needs of [its] retail partners."

10.      However, Scotts bought too much inventory. Making matters worse, and instead of disclosing the excess inventory issue or even just writing the inventory down, the Individual Defendants engaged in a scheme to flood the market with even more inventory, selling too much product to end users. In engaging in this scheme, the Individual Defendants caused Scotts to then mark these sales to its distributors as revenue to maintain the earnings to debt ratios needed to satisfy the Company's debt covenants.

11.      The Individual Defendants caused Scotts to sell products at a clip that far exceeded demand while they represented that the Company had proper inventory levels, that Scotts was experiencing a boom in selling products, and Scotts would not breach its debt covenants. For instance, throughout the Relevant Period, certain Individual Defendants repeatedly represented that Scotts "[didn't] have [an] inventory problem at all" and was "in a

very good place," while citing the strong sales were the result of "selling through high-cost inventory," which caused "peak selling" and "record shipments." Regarding the Company's debt covenants, certain Individual Defendants boasted that Scotts surpassed internal revenue targets with a "net leverage of 5.9 times debt-to-EBITDA comfortably within covenant maximum of 6.25 times." Certain Individual Defendants further boasted that they were "optimistic we will remain within the bounds of our bank covenants" and "[did] not see leverage compliance issues going forward." They further asserted that Scotts was "tracking to do even better" than its guidance, which the Individual Defendants subsequently stated was "really, really important for us to avoid covenant hell."

12.     Throughout the Relevant Period, the Individual Defendants repeatedly and consistently obfuscated the truth to investors about Scotts' business, operations, and prospects. Specifically, the Individual Defendants kept hidden Scotts' true financial figures from investors, the scheme to flood the market to remain in compliance with the Company's debt covenants, which required, among other things, Scotts sales personnel to pressure retailers to purchase excess inventory that retailers did not need, and that the Company was dangerously close to breaching its debt covenants and would require a "exceptional year" to remain in compliance with the debt covenants.[2] Such falsities were included and/or omitted in the Company's proxy solicitations filed with the SEC during the Relevant Period, two of which solicited and received shareholder approval to amend the lucrative incentive plan that materially benefitted the Individual Defendants, among others, at the Company, based on false pretenses, including Scotts actual financial performance and standing.

---

[2] Scotts, to maintain compliance with its debt covenants, even modified the definition of how the Company calculated EBITDA in the fiscal fourth quarter of 2022. Scotts' fiscal year runs from October 1 – September 30.

13. The truth began to emerge on June 8, 2022, when the Company published a press release confessing that refill orders from U.S. retailers for the month of May were more than $300 million below target and that Scotts would have to chop its 2022 full-year earnings guidance in half. The press release further revealed that Scotts was preparing to take on additional debt to cover restructuring charges that were put in place to cut costs further.

14. The market was dismayed by the disclosure. A Truist report declared that "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]." On this news, the price of the Company's common stock fell $9.05 per share, or approximately 9%, from a closing price of $102.18 per share on June 7, 2022 to a closing price of $93.13 per share on June 8, 2022. Yet, the Individual Defendants continued to obfuscate the truth about Scotts' inventory saturation and debt covenant compliance problems.

15. The truth fully emerged on August 2, 2023 when the Company published a press release revealing its financial outcomes for the third quarter ended on July 1, 2023 for the fiscal year ending September 30, 2023 (the "2023 Fiscal Year"). Along with the press release, the Company filed a current report on Form 8-K which disclosed that Scotts amended its debt covenants. Specifically, the disclosure revealed that Scotts had to change its debt covenants to permit a 7.00 times debt-to-EBITDA ratio, from the original ratio of 6.25 times debt-to-EBITDA ratio.

16. Additionally, that same day, Scotts held an earnings conference call to discuss the Company's financial performance for the third quarter of the 2023 Fiscal Year. During the call, the Individual Defendants revealed that sales fell by 6%, gross margins decreased by 420 basis points, that the Company had slashed its fiscal year EBITDA guidance by a massive 25%, and that Scotts had to write down $20 million for "pandemic driven excess inventories."

6

17. On this news, the price of the Company's common stock fell $13.58 per share, or approximately 19%, from a closing market price of $71.44 per share on August 1, 2023, to close at $57.86 per share on August 2, 2023.

18. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by twice seeking shareholder approval of amendments to increase the number of shares available under the Company's Long-Term Incentive Plan (the "Incentive Plan"); and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

19. Additionally, in breach of their fiduciary duties, the Individual Defendants caused

7

the Company to fail to maintain adequate internal controls.

20.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Scotts to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between October 2021 and July 2023, approximately 1,042,462 shares of Scotts common stock were repurchased, costing the Company **over $160.5 million**[3]. As the Company's stock was actually worth only $57.86 per share, the price at which it was trading when markets closed on August 2, 2023, the Company overpaid for repurchases of its own stock **by over $100.2 million** in total.

21.     Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining proceeds of over $11,191,662. Additionally, the Company's largest shareholder, the Hagedorn Partnership, engaged in lucrative insider sales of Company common stock at artificially inflated prices, obtaining proceeds of over $5,886,450.

22.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and President, Division President, Chief Financial Officer ("CFO"), former interim CFO, and its former CFO, to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Ohio, Eastern Division (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants

---

[3] Unless otherwise noted, all emphasis is added.

who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the Company's directors' receipt of material benefits due to the two amendments to the Incentive Plan, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, the former interim CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

29. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Ohio or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

30. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Company is headquartered in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

31. Plaintiff is a current shareholder of Scotts. Plaintiff has continuously held Scotts common stock since June 14, 2021.

**Nominal Defendant Scotts**

32. Scotts is an Ohio corporation with its principal executive offices at 1411 Scottslawn Road, Marysville, Ohio 43041. Scotts' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SMG."

**Defendant Hagedorn**

33. Defendant Hagedorn has served as the Company's CEO since May 2001, Chairman of the Board since January 2003, and as President since October 2023. Additionally, he has served as a Company director since 1995. Previously, he served as President from October

2015 until February 2016. According to the proxy statement that the Company filed with the SEC on December 13, 2023 (the "2023 Proxy Statement"), Defendant Hagedorn beneficially owned 14,813,305 shares of the Company's common stock as of November 27, 2023, or 25.77% of the total voting power of Scotts, through his control of the Hagedorn Partnership and his personal holdings.[4] Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Hagedorn owned approximately $829.8 million worth of Scotts stock as of that date.

34.     For the fiscal year ended September 30, 2021 (the "2021 Fiscal Year"), Defendant Hagedorn received $10,713,912 in total compensation from the Company. This included $1.2 million in base salary, $2,500,122 in stock awards, $2,400,932 in option awards, $3,465,000 in non-equity incentive plan compensation, and $1,147,858 in all other compensation. For the fiscal year ended September 30, 2022 (the "2022 Fiscal Year"), Defendant Hagedorn received $8,169,861 in total compensation from the Company. This included $1,104,000 in salary, $6,000,143 in stock awards, and $1,065,718 in all other compensation. For the 2023 Fiscal Year, Defendant Hagedorn received $11,994,566 in total compensation from the Company. This included $720,00 in salary, $7,881,576        in stock awards, $2,740,931 in option awards and $652,059 in all other compensation.

35.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Hagedorn made the following sales of the Company's common stock:

---

[4]According to the 2023 Proxy Statement, Defendant Hagedorn is a general partner of the Hagedorn Partnership, which owned 13,970,295 shares of the Company's common stock, or 24.65%, of the Company's common stock, as of November 27, 2023. Defendant Hagedorn and Defendant Littlefield, along with their brother Robert Hagedorn, sister Susan Hagedorn and Scotts' COO Nathan E. Baxter, are general partners of the Hagedorn Partnership and share voting power and sole investment power with respect to common shares held by the partnership.

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 13, 2022 | 60,000 | $97.64 | $5,858,160 |
| January 17, 2023 | 50,000 | $60.67 | $3,033,450 |
| May 12, 2023 | 25,000 | $66.91 | $1,672,800 |

Thus, in total before the fraud was exposed, he sold 135,000 shares of Company common stock on inside information, for which he received approximately $10,564,410 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrating his motive in facilitating and participating in the scheme.

36.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Hagedorn, through the Hagedorn Partnership, made the following sales of the Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 7, 2023 | 50,000 | $80.86 | $4,043,000 |
| February 9, 2023 | 23,000 | $80.15 | $1,843,450 |

Thus, in total before the fraud was exposed, Defendant Hagedorn, through the Hagedorn Partnership, sold 73,000 shares of Company common stock on inside information, for which he received, through the Hagedorn Partnership, approximately $5,886,450 in proceeds. These insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. Thus, in total before the fraud was exposed, Defendant Hagedorn profited by more than $16.4 million from insider sales.

37.     The 2023 Proxy Statement stated the following about Defendant Hagedorn:

Mr. Hagedorn has served as CEO of the Company since May 2001, as Chairman of the Board since January 2003, and as President of the Company since October 2023 as well as from October 2015 until February 2016. Mr. Hagedorn is the brother of Katherine Hagedorn Littlefield, a director of the Company.

Having joined the Company in 1987 and the Board in 1995, and with service as CEO and Chairman of the Board for nearly two decades, Mr. Hagedorn has more working knowledge of the Company and its products than any other individual. During his career at the Company, Mr. Hagedorn has developed extensive leadership, international, and marketing/consumer industry experience that has proven invaluable as he leads the Board through a wide range of issues.

38.    Upon information and belief, Defendant Hagedorn is a citizen of Ohio.

**Defendant C. Hagedorn**

39.    Defendant C. Hagedorn is the son of Defendant Hagedorn, who has served as the Company's CEO and the Chairman of the Board since May 2001 and January 2003, respectively. Defendant C. Hagedorn has served as the Company's Division President since January 2021. Previously, Defendant C. Hagedorn served as President of The Hawthorne Gardening Company from May 2014 until January 2021. According to the proxy statement that the Company filed with the SEC on December 13, 2022 (the "2023 Proxy Statement"), as of November 29, 2022, Defendant C. Hagedorn beneficially owned 41,649 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 29, 2022, was $53.55, Defendant C. Hagedorn owned approximately $2.2 million worth of Scotts stock as of that date.

40.    For the 2021 Fiscal Year, Defendant C. Hagedorn received $2,661,917 in total compensation from the Company. This included $637,180 in salary, $500,024 in stock awards, $480,211 in option awards, $1,022,752 in non-equity incentive plan compensation and $21,750 in all other compensation. For the 2022 Fiscal Year, Defendant C. Hagedorn received $1,622,953 in total compensation from the Company. This included $599,833 in salary, $1,000,245 in stock awards, and $22,875 in all other compensation. For the 2023 Fiscal Year, Defendant C. Hagedorn received salary, bonus and other payments in the amount of $1,577,672 from the Company.

41.     The Company's website[5], last accessed on June 26, 2024, stated the following about Defendant C. Hagedorn:

> Chris has played the lead role in launching and building the Hawthorne Gardening Company, elevating the wholly owned ScottsMiracle-Gro subsidiary to record levels. Today, he serves as executive vice president of ScottsMiracle-Gro and division president of Hawthorne, which is focused on providing products and solutions to the hydroponic and indoor growing industry. All aspects of the Hawthorne business report up through Chris, who has held the position since 2014. During his tenure, Hawthorne has acquired leading hydroponic brands, such as General Hydroponics, Vermicrop, Botanicare, Can-Filters, Gavita Horticulture Lighting and Sunlight Supply. Hawthorne has locations throughout North America and in the Netherlands.

> Chris often talks about how the innovation and solutions that are being developed by Hawthorne can be applied to growing plants in a variety of environments, even the most challenging. Prior to his role with Hawthorne, Chris held various positions within ScottsMiracle-Gro, ranging from marketing roles to director of indoor gardening, and previously worked with a New York marketing and advertising agency.

> He has a bachelor's degree from Bowdoin College. Chris enjoys spending time with his wife and two children.

42.     Upon information and belief, Defendant C. Hagedorn is a citizen of New York.

**Defendant Garth**

43.     Defendant Garth has served as the Company's CFO, Chief Administrative Officer, and Executive VP since December 2022. According to the 2023 Proxy Statement, Defendant Garth beneficially owned 7,384 shares of the Company's common stock as of November 27, 2023. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Garth owned approximately $413,651 worth of Scotts stock as of that date.

44.     For the 2023 Fiscal Year, Defendant Garth received $5,652,601 in total

---

[5] https://scottsmiraclegro.com/who-we-are/leadership/chris-hagedorn/.

compensation from the Company. This included $604,167 in salary, $700,000 in bonus, $2,782,880 in stock awards, $638,044 in option awards and $927,510 in all other compensation.

45.     The Company's website[6], last accessed on June 26, 2024, stated the following about Defendant Garth:

> Matt brings a unique and important perspective shaped by decades of experience that have taken him from the shop floor to the C-suite and boardroom. He's able to develop a deep understanding of all facets of the organization, see the whole picture and serve as a strategic partner to the business while enhancing credibility with all stakeholders.
>
> He often says he is most energized as a leader when he is as close to the business as possible – owning the P&L and making decisions that foster great opportunities for associates, new products for customers and consumers and new paths of growth for the company.
>
> It's an approach he strives to instill in the entire finance team, believing his colleagues play a critical role in informing the development of the company's strategy in ways that go beyond accounting, forecasting and financial controls. Through an intense focus on process, a strategic business perspective and a disciplined approach to capital allocation, he empowers the team to have an informed voice to help operators and other leaders achieve the most value optimizing outcomes.
>
> Throughout his career, Matt has led a full complement of corporate and operating functions and has delivered a track record of shareholder value creation. Prior to joining ScottsMiracle-Gro in December 2022, he was chief financial officer and senior vice president of treasury and finance for Minerals Technologies, Inc. and held senior financial positions with Alcoa, Inc.
>
> An avid gym rat and lawn and garden enthusiast, Matt says family is his number 1 priority – and that includes his wife, daughter, son and their Cavachon.

46.     Upon information and belief, Defendant Garth is a citizen of Ohio.

**Defendant Evans**

47.     Defendant Evans has served as a Company director since 2018. Previously, Defendant Evans served as the Company's Executive Vice President and Interim CFO from

---

[6] https://scottsmiraclegro.com/who-we-are/leadership/matt-garth/.

August 2022 until November 2022. According to the 2023 Proxy Statement, Defendant Evans beneficially owned 12,538 shares of the Company's common stock as of November 27, 2023. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Evans owned approximately $702,378 worth of Scotts stock as of that date.

48.     For the 2021 Fiscal Year, Defendant Evans received $285,203 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and 185,203 in stock awards. For the 2022 Fiscal Year, Defendant Evans received $321,317 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $210,067 in stock awards. For the 2023 Fiscal Year, Defendant Evans received $304,125 in total compensation from the Company for his service as Executive Vice President & Interim CFO. This included $281,250 in salary and $22,875 in all other compensation. Additionally, Defendant Evans received $325,049 in total compensation, all in the form of stock awards, for his service as a Company director for the 2023 Fiscal Year.

49.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Evans made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| November 29, 2022 | 1,659 | $53.69 | $89,066 |

Thus, in total before the fraud was exposed, he sold 1,659 shares of Company common stock on inside information, for which he received approximately $89,066 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrating his motive in facilitating and participating in the scheme.

50.     The 2023 Proxy Statement stated the following about Defendant Evans:

16

Mr. Evans is a director of Cardinal Health Inc. ("Cardinal Health"), a global integrated healthcare services and products company. Mr. Evans serves on the Audit and Risk Oversight Committees at Cardinal Health.

Mr. Evans served as Executive Vice President & Interim Chief Financial Officer of the Company from August 2022 until November 2022.

Mr. Evans served as the Interim Chief Financial Officer of Cardinal Health from September 2019 until May 2020, after a transition role beginning in July 2019. Mr. Evans previously served as Executive Vice President and Chief Financial Officer of Battelle Memorial Institute ("Battelle"), a private research and development organization, from March 2013 until January 2018. Mr. Evans' responsibilities at Battelle included strategy, information technology and cybersecurity. Prior to joining Battelle, Mr. Evans served in various managerial roles at the Company, including, most recently, Chief Financial Officer and Executive Vice President, Strategy and Business Development from September 2006 until February 2013.

Mr. Evans' financial acumen and intimate familiarity with the Company and the lawn and garden industry makes him uniquely qualified to serve as a member of the Board. Mr. Evans qualifies as an "audit committee financial expert" as that term is defined in the applicable rules and regulations of the SEC ("SEC Rules") and his financial experience, including capital markets, investor relations and cybersecurity, are particularly valuable to the Board in his service as Chair of the Audit Committee and member of the Finance Committee.

51.     Upon information and belief, Defendant Evans is a citizen of Ohio.

**Defendant Miller**

52.     Defendant Miller served as the Executive Vice President and CFO of the Company from January 2021 to August 2022 and Vice President of Finance of Hawthorne from 2016 to 2020. According to the 2023 Proxy Statement, Defendant Miller beneficially owned 10,215 shares of the Company's common stock as of November 29, 2022. Given that the price per share of the Company's common stock at the close of trading on November 29, 2022 was $53.55, Defendant Miller owned approximately $547,013 worth of Scotts stock as of that date.

53.     For the 2021 Fiscal Year, Defendant Miller received $2,908,890 in total compensation from the Company. This included $492,676 in salary, $1,375,147 in stock awards, $360,174 in option awards, $614,492 in non-equity incentive plan compensation, and $66,401 in

all other compensation. For the 2022 Fiscal Year, Defendant Miller received $1,890,649 in total compensation from the Company. This included $552,308 in salary, $1,2000,082 in stock awards, and $138,259 in all other compensation.

54.     The Company's website[7], last accessed on June 26, 2024, stated in a press release the following about Defendant Miller:

> Cory brings over 20 years of financial and leadership experience. His contributions while at the helm of finance for Hawthorne have proved to be invaluable, including the integration of Sunlight Supply and several other deals that have led to the current Hawthorne portfolio," said Jim Hagedorn, chairman and chief executive officer. "Cory has been deeply involved in the business, excelling in a series of corporate and operating roles here at Scotts. He has confidently assumed the duties as interim CFO and will now do so on a permanent basis. I am confident in his ability to continue to support our Company's growth strategies."

> Miller's recent contributions to the growth and success of Hawthorne Gardening Company enabled him to emerge as one of the Company's brightest leaders. His tenure at the Company spans a little more than two decades in which he has held a variety of roles. In addition to serving as vice president of finance for Hawthorne from 2016 to 2020, Miller also served the organization as vice president and chief audit executive for ScottsMiracle-Gro from 2015 to 2016. Other roles have included vice president of finance and business development and finance lead for ScottsMiracle-Gro's North America sales.

> Miller received his bachelor's in business administration from Bowling Green State University and is a certified public accountant. Prior to joining ScottsMiracle-Gro, Miller held auditor roles at EY and served as corporate accountant with Borden Capital Management Partners.

55.     Upon information and belief, Defendant Miller is a citizen of Ohio.

**Defendant Finn**

56.     Defendant Finn served as a Company director from 2014 until November 7, 2022. During his time as a Company director, Defendant Finn served as a member of the Finance Committee. According to the 2023 Proxy Statement, Defendant Finn beneficially owned 12,762

---

[7] https://investor.scotts.com/news-releases/news-release-details/scottsmiracle-gro-names-cory-miller-chief-financial-officer.

shares of the Company's common stock as of November 29, 2022. Given that the price per share of the Company's common stock at the close of trading on November 29, 2022 was $53.55, Defendant Finn owned approximately $683,405 worth of Scotts stock as of that date.

57. For the 2021 Fiscal Year, Defendant Finn received $285,203 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $185,203 in stock awards. For the 2022 Fiscal Year, Defendant Finn received $321,317 in total compensation from the Company. This included $11,250 fees earned or paid in cash and $210,067 in stock awards.

58. The Company's proxy statement filed on Schedule 14A with the SEC on December 15, 2021 (the "2022 Proxy Statement") stated the following about Defendant Finn:

> Mr. Finn is a director of WaveGuide Corporation, a health care technology company, Owl Rock Capital Corporation, an investment firm specializing in mezzanine loan investments in middle-market companies, and X-Vax Technology, Inc. an early stage biotechnology company. Mr. Finn is also the Chairman of Star Mountain Capital LLC, a private equity firm.

> Mr. Finn served as the Chief Executive Officer and Chairman of Asset Management Finance Corporation. Mr. Finn was Chairman and Head of Alternative Investments at Credit Suisse Group ("Credit Suisse"). Mr. Finn has held many positions within Credit Suisse and its predecessor firms, including President of Credit Suisse First Boston ("CSFB"), President of Investment Banking, Co-President of Institutional Securities, Chief Executive Officer of Credit Suisse USA and a member of the Office of the Chairman of CSFB. He was also a member of the Executive Board of Credit Suisse. Mr. Finn served as principal and partner of private equity firm Clayton, Dubilier & Rice.

> Mr. Finn has over 30 years of experience in the financial industry, including his service in leadership roles in the investment banking and private equity sectors, which provides the Board with additional expertise in strategically growing businesses. Mr. Finn's service as the Co-Head of Mergers and Acquisitions for Credit Suisse augments the Board's capabilities in analyzing and evaluating acquisition opportunities.

59. Upon information and belief, Defendant Finn is a citizen of Ohio.

**Defendant Hanft**

60. Defendant Hanft has served as a Company director since 2010. He also serves as

a member of the Finance Committee and as a member of the Innovation and Technology Committee. According to the 2023 Proxy Statement, Defendant Hanft beneficially owned 32,040 shares of the Company's common stock as of November 27, 2023. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Hanft owned approximately $1.8 million worth of Scotts stock as of that date.

61.     For the 2021 Fiscal Year, Defendant Hanft received $285,203 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $185,203 in stock awards. For the 2022 Fiscal Year, Defendant Hanft received $321,317 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $210,067 in stock awards. For the 2023 Fiscal Year, Defendant Hanft received $353,799 in total compensation from the Company. This included $28,750 in fees earned or paid in cash and $325,049 in stock awards.

62.     The 2023 Proxy Statement stated the following about Defendant Hanft:

Mr. Hanft is the founder and Chief Executive Officer of Hanft Ideas LLC ("Hanft Ideas"), a strategic consultancy that provides marketing and branding advice and insights to leading consumer and business-to-business companies, including many leading digital brands ranging from cybersecurity to artificial intelligence, digital health, fintech, foodtech and adtech. He writes broadly about the consumer culture for numerous publications, is a podcast co-host, and is the co-author of "Dictionary of the Future." He is also a frequent commentator on marketing and branding issues. Mr. Hanft previously served as founder and Chief Executive Officer of Hanft Unlimited, Inc., a marketing organization created in 2004 that included an advertising agency, strategic consultancy and custom-publishing operation. Mr. Hanft also serves as a director for 1-800-FLOWERS.COM Inc., and sits on a number of start-up boards as well as advisory boards, including Sensory Cloud, named one of the Fast Company's most innovative companies.

As the Chief Executive Officer of Hanft Ideas, Mr. Hanft brings his extensive leadership and experience in the marketing and advertising industry, as well as his digital technology experience to the Board. His knowledge of the consumer and retail landscape; the rapidly changing media environment including social media; agtech and the cannabis industry; the consumer acquisition ecosystem, ESG oversight, cybersecurity and human capital management have proven to be

particularly valuable to the Board.

63.     Upon information and belief, Defendant Hanft is a citizen of New York.

**Defendant Johnson**

64.     Defendant Johnson has served as a Company director since 2010. He also serves as the Chair of the Governance Committee and as a member of both the Compensation and Innovation and Technology Committees. According to the 2023 Proxy Statement, Defendant Johnson beneficially owned 17,506 shares of the Company's common stock as of November 27, 2023. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Johnson owned approximately $980,686 worth of Scotts stock as of that date.

65.     For the 2021 Fiscal Year, Defendant Johnson received $285,203 in total compensation from the Company. This included $100,000 for fees earned or paid in cash and $185,203 in stock awards. For the 2022 Fiscal Year, Defendant Johnson received $321,317 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $210,067 in stock awards. For the 2023 Fiscal Year, Defendant Johnson received $353,799 in total compensation from the Company. This included $28,750 in fees earned or paid in cash and $325,049 in stock awards.

66.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Johnson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| May 4, 2022 | 2,305 | $113.62 | $261,898 |
| November 18, 2022 | 3,560 | $56.47 | $201,043 |
| February 7, 2023 | 935 | $80.48 | $75,245 |

Thus, in total before the fraud was exposed, he sold 6,800 shares of Company common stock on

inside information, for which he received approximately $538,186 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrating his motive in facilitating and participating in the scheme.

67.     The 2023 Proxy Statement stated the following about Defendant Johnson:

Mr. Johnson is the President and Chief Executive Officer of Stephen L. Johnson and Associates Strategic Consulting, LLC ("Johnson and Associates"), a strategic provider of business, research and financial management and consulting services formed in 2009. Prior to forming Johnson and Associates, Mr. Johnson worked for the U.S. Environmental Protection Agency for 30 years, where he became the first career employee and scientist to serve as Administrator, a position he held from January 2005 until January 2009. Mr. Johnson serves as a director of Frederick Memorial Hospital and as a Trustee of Taylor University.

As President and Chief Executive Officer of Johnson and Associates and the former Administrator of the U.S. Environmental Protection Agency, as well as a lifelong scientist, Mr. Johnson brings considerable leadership in ESG oversight (including serving as the Board liaison to management on ESG matters), human capital management, and the innovation and technology arenas to the Board and fulfills the Board's need for regulatory and environmental expertise as identified by the Governance Committee.

68.     Upon information and belief, Defendant Johnson is a citizen of Maryland.

**Defendant Kelly**

69.     Defendant Kelly has served as a Company director since 2006. He also serves as the Chair of the Innovation and Technology Committee and as a member of both the Compensation and Finance Committees. According to the 2023 Proxy Statement, Defendant Kelly beneficially owned 12,696 shares of the Company's common stock as of November 27, 2023. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Kelly owned approximately $711,229 worth of Scotts stock as of that date.

70.     For the 2021 Fiscal Year, Defendant Kelly received $285,203 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $185,203 in stock awards. For the 2022 Fiscal Year, Defendant Kelly received $321,317 in total

compensation from the Company. This included $111,250 in fees earned or paid or in cash and $210,067 in stock awards. For the 2023 Fiscal Year, Defendant Kelly received $353,799 in total compensation from the Company. This included $28,750 in fees earned or paid in cash and $325,049 in stock awards.

71.     The 2023 Proxy Statement stated the following about Defendant Kelly:

Mr. Kelly is a former director of GameStop Corp., where he also chaired the Compensation Committee. Mr. Kelly also served as Executive Vice President, Transition Integration of Sprint Communications ("Sprint"), a global communications company, from December 2005 until April 2006. He served as the Chief Strategy Officer of Sprint from August 2005 until December 2005. He served as the Executive Vice President and Chief Operating Officer of Nextel Communications, Inc., which became Sprint, from February 2003 until August 2005, and as Executive Vice President and Chief Marketing Officer of Nextel Communications, Inc. from 1996 until February 2003.

Our Corporate Governance Guidelines state that, in general, a director should not stand for re-election once he or she has reached the age of 72, but provides the Board with flexibility to nominate a director who is age 72 or older based on individual circumstances. Mr. Kelly turned 76 on April 29, 2023. The Board, in alignment with a recommendation from the Governance Committee, reviewed Mr. Kelly's individual circumstances, Company priorities, Board needs, and Mr. Kelly's experience and expertise and determined that nominating Mr. Kelly is in the best interests of the Company.

Having served at various times as Chief Strategy Officer, Chief Operating Officer and Chief Marketing Officer of Sprint, Mr. Kelly brings an extensive skill set to the Board. His blend of leadership, innovation and technology, international, marketing/consumer industry and financial experience make him a key advisor to the Board on a full range of consumer and strategy-related matters.

72.     Upon information and belief, Defendant Kelly is a citizen of Vermont.

**Defendant Littlefield**

73.     Defendant Littlefield is the sister of Defendant Hagedorn, who is the CEO, President, and Chairman of the Board of the Company. She has served as a Company director since 2000 and has served as Vice Chair of the Board since 2013. Defendant Littlefield also serves as Chair of the Finance Committee and as a member of the Innovation and Technology Committee.

According to the 2023 Proxy Statement, as of November 27, 2023, Defendant Littlefield beneficially owned 13,977,142 shares of Company's common stock, or 24.66% of the total voting power of Scotts, through her control of the Hagedorn Partnership and her personal holdings.[8] Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Littlefield owned approximately $783 million worth of Scotts stock as of that date.

74. For the 2021 Fiscal Year, Defendant Littlefield received $285,203 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $185,203 in stock awards. For the 2022 Fiscal Year, Defendant Littlefield received $321,317 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $210,067 in stock awards. For the 2023 Fiscal Year, Defendant Littlefield received $28,750 in total compensation from the Company. This included $28,750 in fees earned or paid in cash.

75. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Littlefield, through the Hagedorn Partnership, made the following sales of the Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 7, 2023 | 50,000 | $80.86 | $4,043,000 |
| February 9, 2023 | 23,000 | $80.15 | $1,843,450 |

Thus, in total before the fraud was exposed, Defendant Littlefield, through the Hagedorn Partnership, sold 73,000 shares of Company common stock on inside information, for which she

---

[8] According to the 2023 Proxy Statement, Defendant Littlefield is a general partner of the Hagedorn Partnership, which owned 13,970,295 shares of the Company's common stock, or 24.65%, of the Company's common stock, as of November 27, 2023. Defendant Hagedorn, Defendant Littlefield, along with their brother Robert Hagedorn, sister Susan Hagedorn and COO Nathan E. Baxter, are general partners of the Hagedorn Partnership and share voting power and sole investment power with respect to common shares held by the partnership.

received, through the Hagedorn Partnership, approximately $5,886,450 in proceeds. These insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrating her motive in facilitating and participating in the scheme.

76.     The 2023 Proxy Statement stated the following about Defendant Littlefield:

Ms. Littlefield is a general partner of the Hagedorn Partnership, L.P. She also serves on the board for the Hagedorn Family Foundation, Inc., a charitable organization. She is the sister of James Hagedorn, the Company's Chairman of the Board, CEO & President.

As a general partner and former Chair of the Hagedorn Partnership, L.P., the Company's largest shareholder, Ms. Littlefield brings a strong shareholder voice to the Board. She also has significant innovation and technology experience, having served on the Company's Innovation and Technology Committee (and its predecessors) since May 2004, as well as on the Innovation Advisory Board from its formation in 2001 until January 2014 when it was retired.

77.     Upon information and belief, Defendant Littlefield is a citizen of Florida.

**Defendant Mistretta**

78.     Defendant Mistretta served as a Company director from January 2007 until January 30, 2024. During her time as a Company director, she served as a member of both the Audit and Compensation Committees. According to the 2023 Proxy Statement, Defendant Mistretta beneficially owned 19,339 shares of Company's common stock as of November 27, 2023. Given that the price per share of the Company's common stock at the close of trading on November 27, 2023 was $56.02, Defendant Mistretta owned approximately $1.1 million worth of Scotts stock as of that date.

79.     For the 2021 Fiscal Year, Defendant Mistretta received $285,203 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $185,203 in stock awards. For the 2022 Fiscal Year, Defendant Mistretta received $321,317 in

total compensation from the Company. This included $111,250 in fees earned or paid in cash and $210,067 in stock awards. For the 2023 Fiscal Year, Defendant Mistretta received $353,799 in total compensation from the Company. This included $28,750 in fees earned or paid in cash and $325,049 in stock awards.

80.     The 2023 Proxy Statement stated the following about Defendant Mistretta:

Ms. Mistretta is a retired partner of Russell Reynolds Associates ("Russell Reynolds"), an executive search firm, where she served as a partner from February 2005 until June 2009. She was a member of Russell Reynolds' Not-For-Profit Sector and was responsible for managing executive officer searches for many large philanthropic organizations, with a particular focus on searches for presidents, deans and financial officers of educational institutions. Based in New York City, she also was active in the CEO/Board Services Practice of Russell Reynolds. Prior to joining Russell Reynolds, Ms. Mistretta was with JPMorgan Chase & Co. and its heritage institutions (collectively, "JPMorgan") for 29 years and served as a Managing Director in Investment Banking from 1991 to 2005. Ms. Mistretta is a director of Worthington Steel, Inc. where she serves on the Audit Committee.

Throughout her nearly 30-year career at JPMorgan, Ms. Mistretta demonstrated a range of skills including leadership, international, marketing/consumer industry, retail and financial experience, including through roles as Managing Director responsible for Investment Bank Marketing and Communications, industry head responsible for the Global Diversified Industries group and industry head responsible for the Diversified, Consumer Products and Retail Industries group. Ms. Mistretta qualifies as an "audit committee financial expert" as that term is defined in the applicable SEC Rules and her financial experience, ESG oversight and human capital expertise is particularly valuable to the Board in her role as a member of the Audit Committee and the Compensation Committee.

81.     Upon information and belief, Defendant Mistretta is a citizen of New York.

**Defendant Volas**

82.     Defendant Volas served as a Company director from August 3, 2021 until July 11, 2023. During his time as a Company director, he served as a member of both the Audit and Finance Committees.  According to the 2023 Proxy Statement, Defendant Volas beneficially owned 6,450 shares of the Company's common stock as of November 29, 2022. Given that the price per share of the Company's common stock at the close of trading on November 29, 2022 was $53.55,

Defendant Volas owned approximately $345,397 worth of Scotts stock as of that date.

83.     For the 2021 Fiscal Year, Defendant Volas received $93,822 in total compensation from the Company. This included $16,667 in fees earned or paid in cash and $77,115 in stock awards. For the 2022 Fiscal Year, Defendant Volas received $321,317 in total compensation from the Company. This included $111,250 in fees earned or paid in cash and $210,067 in stock awards.

84.     The 2023 Proxy Statement stated the following about Defendant Volas:

Mr. Volas served as Chief Executive Officer and a director of TopBuild Corp., a leading installer and distributor of insulation products, between June 2015 and December 2020. Mr. Volas is also a director of Trex Company.

Mr. Volas' professional experience as a public company chief executive officer and as a senior executive of Masco Corporation, a consumer products company, brings critical operational expertise to the Board. In addition, his extensive financial experience on a range of issues relevant to public companies provides additional support to the Board's oversight function. Mr. Volas qualifies as an "audit committee financial expert" as that term is defined in the applicable SEC Rules and his financial experience is also particularly valuable to the Board in his service as a member of the Audit Committee and the Finance Committee.

85.     Upon information and belief, Defendant Volas is a citizen of Michigan.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

86.     By reason of their positions as officers, directors, and/or fiduciaries of Scotts and because of their ability to control the business and corporate affairs of Scotts, the Individual Defendants owed Scotts and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Scotts in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Scotts and its shareholders so as to benefit all shareholders equally.

87.     Each director and officer of the Company owes to Scotts and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in

the use and preservation of its property and assets and the highest obligations of fair dealing.

88. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Scotts, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

89. To discharge their duties, the officers and directors of Scotts were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Scotts, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Scotts' Board at all relevant times.

91. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal

controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

92. To discharge their duties, the officers and directors of Scotts were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Scotts were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio and the United States, and pursuant to Scotts' own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Scotts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Scotts and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

29

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Scotts' operations would comply with all applicable laws and Scotts' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

93.     Each of the Individual Defendants further owed to Scotts and the shareholders the duty of loyalty requiring that each favor Scotts' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

94.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Scotts and were at all times acting within the course and scope of such agency.

95.     Because of their advisory, executive, managerial, directorial, and controlling positions with Scotts, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

96.      The Individual Defendants, because of their positions of control and authority,

were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Scotts.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

97.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

98.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

99.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Scotts was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

100.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

101.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Scotts, and was at all times acting within the course and scope of such agency.

## SCOTTS' CODE OF CONDUCT

102.    Scotts' Code of Conduct "applies to every ScottsMiracle-Gro associate, officer and member of our Board of Directors." Additionally, the Code of Conduct "is intended as an overview of the Company's values, which underlie our policies."

103.    Under the heading "WHAT IS EXPECTED OF LEADERS," the Code of Conduct states the following, in relevant part:

> Leaders at our Company have a special responsibility to demonstrate our values through their actions. They should hold themselves to the highest standards of ethical conduct and foster an environment of integrity, honesty and respect. They should encourage others to act with integrity to avoid even the appearance of a violation of our guiding principles. Leaders must never retaliate against anyone for raising an ethics issue, assisting in an investigation, or participating in any proceeding relating to an alleged violation of this Code or any law or regulation.

104.    Under the heading "WE STAND FOR OUR SHAREHOLDERS," the Code of Conduct states the following about Corporate Governance:

> *Corporate Governance*: We have an effective governance and compliance infrastructure that helps achieve our business objectives and create value for our shareholders. This includes the ethical behavior of our management team and our open and responsive approach to concerns raised by others. Our Board of Directors

periodically reviews our key governance documents and policies. In addition, we update our Board regarding fiduciary duties and other governance matters as appropriate and invite our Board to attend numerous training opportunities each year. Our Board's Compensation Committee follows a philosophy that awards incentives to corporate officers to achieve our operational and strategic goals, which aligns our interests with those of our shareholders.

105.     Under the same heading, in the subsection titled "*Confidentiality of Company Information*," the Code of Conduct states the following:

We consider every piece of information we own as an asset, and we are careful to safeguard our confidential information. We do not reveal confidential or non-public information about the Company, our customers, suppliers, vendors or anyone else. We respond to legitimate inquiries from our stakeholders without releasing confidential information or violating securities laws.

106.     Under the same heading, in the subsection titled "*Insider Trading*," the Code of Conduct states the following: "We treat "inside information" appropriately and lawfully. Anyone who has material inside information about ScottsMiracle-Gro or a ScottsMiracle-Gro customer, supplier or competitor must not use it for personal gain or provide it to others."

107.     Under the same heading, in the subsection titled "*External Communications/Social Media*," the Code of Conduct states the following about:

Generally, our Corporate Communications and Investor Relations Departments manage external communications about ScottsMiracle-Gro. When using social media services to communicate about our products and services, we are truthful, respectful of others, and transparent in disclosing our relationship with ScottsMiracle-Gro.

108.     Under the same heading, in the subsection titled "*Conflicts of Interest*," the Code of Conduct states the following:

We do not take advantage of an opportunity that belongs to the Company for our own personal gain. We appreciate that opportunities that we discover through our work here or as a result of Company property or information belong to ScottsMiracle-Gro. We do not engage in activities that create, or even appear to create, conflict between our personal interests and the interests of ScottsMiracle-Gro.

109.     Under the same heading, in the subsection titled "*Accuracy in Business Records and Financial Reporting*," the Code of Conduct states the following:

> We are committed to integrity and honesty in financial reporting to protect our financial strength and reputation. This includes not only financial accounts, but other records such as quality reports, time records, expense reports, benefits claim forms and employment applications. We do not enable another person's efforts to evade taxes or local currency laws.

110.     Under the heading "WHY WE HAVE A CODE," the Code of Conduct states the following about waivers of the Code:

> For members of the Board of Directors and our executive officers, waivers of this Code may only be made by the Board or a Board committee, and will be disclosed publicly as required by law or New York Stock Exchange Rules. Any waiver for other officers, associates or representatives may be made only by the Chief Executive Officer or if the CEO is not available, the General Counsel together with the head of Global Human Resources.

111.     Under the heading "WE STAND FOR AN ETHICAL, COMPETITIVE MARKETPLACE," the Code of Conduct states the following about advertising, in relevant part: "We do not make **misleading or false statements about our products** or those of our competitors."

112.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Additionally, three of the Individual Defendants violate the Code of Conduct by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants breaching their fiduciary duties to the Company by causing the Company to issue false and misleading statements. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers

34

and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## SCOTTS' AUDIT COMMITTEE CHARTER

113.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of The Scotts Miracle-Gro Company (the "Company") is responsible for assisting the Board in the oversight of (i) the integrity of the Company's financial statements and financial reporting process, (ii) the Company's compliance with legal and regulatory requirements (collectively, "Applicable Rules"), (iii) the qualification, independence and performance of the Company's independent registered public accounting firm (the "External Auditor"), (iv) the performance of the Company's internal audit function, and (v) the performance of other Committee functions as set forth in this charter.

114.    The Audit Committee Charter, under the heading "Responsibilities," states that, "[t]he Committee's principal responsibility is one of oversight. The fundamental responsibility for the Company's financial statements and disclosures rests with management and the External Auditor."

115.    Under the same heading, in the subsection titled "*External Auditor Retention and Oversight*," states the responsibilities of the Audit Committee are as follows:

> 1. Select and oversee the work of the External Auditor. The Committee shall have the sole authority to retain; evaluate the qualifications, performance and independence of; compensate; and replace the External Auditor and any other independent registered public accounting firm retained for the purpose of preparing or issuing an audit report or performing any other related work such as any other audit, review, or attest services for the Company. The External Auditor shall report directly to the Committee.
>
> 2. Obtain annually from the External Auditor a written report regarding: (i) the External Auditor's internal quality-control procedures; (ii) any material issues

raised by the most recent internal quality-control review, or peer review, of the External Auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the External Auditor, and any steps taken to deal with any such issues; and (iii) all relationships between the External Auditor and the Company, in order to assess the External Auditor's independence.

3. Assure the regular rotation of the lead audit partner of the External Auditor as required by Applicable Rules.

4. Review and preapprove (which may be pursuant to preapproval policies and procedures) both audit and non-audit services to be provided by the External Auditor in accordance with Applicable Rules. Consider whether the External Auditor's provision of permissible non-audit services is compatible with the External Auditor's independence requirement. The authority to grant preapprovals may be delegated to one or more designated members of the Committee, whose decisions will be presented to the full Committee at its next regularly scheduled meeting.

5. Set clear hiring policies consistent with governing laws and regulations, for employees or former employees of the External Auditor.

116. Under the same heading, in the subsection titled "*Independent Audit*," states the

responsibilities of the Audit Committee are as follows:

6. Review with the External Auditor, and approve, prior to the beginning of the External Auditor's audit, the scope of the External Auditor's examination.

7. Discuss with the External Auditor the matters required to be described by Auditing Standard No. 16, Communications with Audit Committees, as adopted by the Public Company Accounting Oversight Board, including, without limitation, any difficulties encountered in the course of the work, scope and timing of the audit plan, including the External Auditor's review of internal control over financial reporting, overall audit strategy and any restriction on the scope of the External Auditor's activities or on access to requested information, and any significant disagreements with management.

8. Discuss with management and the External Auditor, and resolve, any disagreements regarding financial reporting.

9. Obtain a report from the External Auditor regarding the following: (i) All critical accounting policies and practices. (ii) All alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the External

Auditor. (iii) Other material written communications between the External Auditor and management, including but not limited to the management letter and schedule of unadjusted differences.

117. Under the same heading, in the subsection titled "*Disclosure and Financial Reporting*," states the responsibilities of the Audit Committee are as follows:

10. Review and discuss with management and the External Auditor the Company's consolidated annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under the section "Management's Discussion and Analysis of Financial Condition and Results of Operation", prior to filing with the Securities and Exchange Commission ("SEC") and recommend whether the annual audited financial statements should be included in the Company's annual report on Form 10-K.

11. Review management's report on internal control over financial reporting prior to its inclusion in the annual report on Form 10-K.

12. Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls, and any special audit steps adopted in light of material control deficiencies.

13. Prepare the Committee report required by the proxy rules of the SEC to be included in the Company's annual proxy statement.

14. Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies, prior to issuance and in accordance with Applicable Rules.

15. Receive and review any disclosure from the Company's CEO and CFO made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of: (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

16. Review other relevant reports or financial information submitted by the Company to the public, the SEC, or any other governmental body that oversees financial reporting, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the independent auditor (or summaries thereof).

118.     Under the same heading, in the subsection titled "*Oversight of the Internal Audit Function*," states the responsibilities of the Committee as follows:

> 23. Discuss with management, the Chief Internal Auditor and the External Auditor the internal audit function, the adequacy and scope of the annual internal audit plan, budget and staffing, and any recommended material changes in the planned scope of the annual internal audit plan. The Chief Internal Auditor may at any time, at such person's option or at the direction of the Committee, report on any matter directly to the Committee. The Committee has the authority to meet privately with any and all internal audit staff at any time, or from time to time, at the Committee's sole discretion. The Committee will review and concur in the appointment, replacement, performance, and compensation for the Company's Chief Internal Auditor, who shall report directly to the Committee for functional purposes, but report to the Company's Chief Financial Officer for administrative purposes.

> 24. Periodically review, with the Chief Internal Auditor, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the function's work.

> 25. Annually, review and recommend changes, if any, to the Internal Audit Charter.

> 26. Review the materials (e.g., reports, memos, etc.) that the Chief Internal Auditor provides to the Committee.

> 27. Periodically inquire of the Chief Internal Auditor regarding the steps taken to comply with the Institute of Internal Auditors professional standards and the internal audit function's internal policies.

119.     Under the same heading, in the subsection titled "*Oversight of the Internal Controls*," states the responsibilities of the Committee as follows:

> 28. Review and discuss with management and the External Auditor the assessment of the effectiveness of the Company's internal control over financial reporting and the report on internal control over financial reporting made by management and the attestation report of the External Auditor on the Company's internal control over financial reporting, in each case as required by Applicable Rules.

> 29. Review at least annually steps adopted to address any material control deficiencies and significant internal control recommendations identified through the internal or external audit process and ensure that appropriate corrective actions are instituted.

30. Establish and oversee procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing matters, or other compliance matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding accounting or auditing matters.

31. Consider the risk of management's ability to override the Company's internal controls.

32. Receive reports on matters of significance arising from work performed by other providers of internal control assurance to senior management and the Board.

120.     Under the same heading, in the subsection titled "*General Compliance and Oversight*," states the responsibilities of the Committee as follows:

33. Meet separately with management, the Chief Internal Auditor, and the External Auditor periodically.

34. Report to the Board and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualifications, performance, and independence of the External Auditor, or the performance of the internal audit function.

35. Establish such other rules and operating procedures in order to fulfill its obligations under this Charter and Applicable Rules as and when the Committee deems necessary or appropriate.

36. Review, no less frequently than quarterly, with the Chief Executive Officer and the Chief Financial Officer the Company's disclosure controls and procedures and management's conclusions about the adequacy of such disclosure controls and procedures.

37. Receive and review reports from the Chief Ethics Officer and/or General Counsel/Chief Compliance Officer at least annually regarding the Company's compliance program.

38. Oversee, in consultation with the Governance Committee, the implementation of and compliance with the Company's Code of Business Conduct and Ethics (the "Code of Conduct").

39. Review with the Company's legal counsel any legal, compliance, and regulatory
matters that could have a significant impact on the Company's financial statements.

40. Receive and review reports from the Chief Ethics Officer and/or General Counsel/Chief Compliance Officer at least quarterly regarding those ethics and compliance incidents reported during the applicable period, whether pursuant to the Code of Conduct, Company policies, or otherwise, that involve accounting, auditing, or financial reporting, as well as the status of any such ethics and compliance incidents that were reported but not resolved during a prior period.

41. Receive, in consultation with the Governance Committee, reports from the Chief Ethics Officer and/or General Counsel/Chief Compliance Officer regarding, and promptly review, any ethics and compliance incident reported, whether pursuant to the Code of Conduct, Company policies, or otherwise, that constitutes an illegal act or violation of ethics policy by a member of the Board or an executive officer of the Company.

42. At least annually, the Chairperson of the Committee shall meet with the Chairperson of the Governance Committee to discuss those ethics and compliance incidents reviewed by each such committee during the applicable period, as well as the status of any such ethics and compliance incidents reviewed, but not resolved by, each such committee during a prior period.

43. Perform any other activities consistent with this Charter, the Company's bylaws, and governing laws that the Board or the Committee determines are necessary or appropriate.

121. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

122.    Founded in 1868 by Orlando M. Scott and incorporated in Ohio, Scotts began by selling lawn seed and, since its founding, has been headquartered in Marysville, Ohio. By the mid-1900s, the Company became widely known for its development of lawn fertilizers and grass seeds in the consumer lawn care industry. Since then, Scotts has grown considerably through its acquisitions of other consumer-focused businesses relating to plant food and weed, pest, and disease control products.

123.    In 1995, Scotts merged with Miracle-Gro, a company founded in Long Island, New York in 1951 by Horace Hagedorn and Otto Stern that manufactured and sold water-soluble garden plant foods. In connection with the merger, former Miracle-Gro shareholders became shareholders of the newly combined company. As such, Horace Hagedorn's family became significant shareholders of Scotts through their control of the Hagedorn Partnership.[9]

124.    Approximately four years later, in 1999, Scotts acquired the Ortho® brand in the United States and obtained exclusive rights to market Monsanto's consumer Roundup® brand within the United States and other contractually specified countries.

125.    Scotts' business is divided into three segments: U.S. Consumer (which covers the consumer lawn and garden business in the U.S.), Hawthorne (which is a wholly owned subsidiary of Scotts and focuses primarily on hydroponics for the rapidly expanding cannabis industry) and Other (which covers Scotts' consumer lawn and garden business in Canada).

126.    Today, the Company's product portfolio includes Scotts® and Turf Builder® lawn fertilizer and Scotts® grass seed products; Miracle-Gro® soil, plant food and

---

[9] Today, Defendants Hagedorn and Littlefield, along with their brother Robert Hagedorn, sister Susan Hagedorn, and COO of the Company, Nathan E. Baxter, hold approximately 24% of the total voting power of Scotts through their control of the Hagedorn Partnership.

gardening products; Ortho® herbicide and pesticide products; and Tomcat® rodent control and animal repellent products. Scotts largely sells its products through third-party distributors.

127. During Relevant Period, the Company was highly leveraged. Indeed, Scotts operated under senior secured credit facilities that featured multiple restrictive covenants and cross-default provisions that required Scotts to retain specific financial ratios. If Scotts breached any of the covenants, the breach could trigger a default, thereby allowing lenders to declare all outstanding indebtedness immediately due and payable.

128. One of the covenants required Scotts to maintain a EBITDA ratio under 6.25. To maintain compliance with the EBITDA ratio covenant, Scotts was incentivized to flood its sales networks with inventory. At the beginning of the Relevant Period, the Company had approximately $2.3 billion of debt. By the end of the Relevant Period, Scotts' debt had skyrocketed to $3.1 billion.

129. In 2020 and 2021, the Company lost out on millions of dollars in sales because of insufficient inventory to meet increasing demand. From this experience, Scotts considerably raised its inventory for both the U.S. Consumer and Hawthorne segments to "ensure [it] could service the needs of [its] retail partners."

130. However, Scotts bought too much inventory. Making matters worse, and instead of disclosing the excess inventory issue or even just writing the inventory down, the Individual Defendants engaged in a scheme to flood the market with even more inventory than could be sold to end users. In engaging in this scheme, the Individual Defendants caused Scotts to then mark these sales to its distributors as revenue to maintain the earnings to debt ratios needed to satisfy the Company's debt covenants.

131. The Individual Defendants caused Scotts to sell products at a clip that far exceeded demand while they represented that the Company had proper inventory levels, that

Scotts was experiencing a boom in selling products, and Scotts would not breach its debt covenants. For instance, throughout the Relevant Period, certain Individual Defendants repeatedly represented that Scotts "[didn't] have [an] inventory problem at all" and was "in a very good place," while citing the strong sales were the result of "selling through high-cost inventory," which caused "peak selling" and "record shipments." Regarding the Company's debt covenants, certain Individual Defendants boasted that Scotts surpassed internal revenue targets with a "net leverage of 5.9 times debt-to-EBITDA comfortably within covenant maximum of 6.25 times." Certain Individual Defendants further boasted that they were "optimistic we will remain within the bounds of our bank covenants" and "[did] not see leverage compliance issues going forward." They further asserted that Scotts was "tracking to do even better" than its guidance, which the Individual Defendants subsequently stated was "really, really important for us to avoid covenant hell."

132. Throughout the Relevant Period, the Individual Defendants repeatedly and consistently obfuscated the truth to investors about Scotts' business, operations, and prospects. Specifically, the Individual Defendants kept hidden Scotts' true financial figures from investors, the scheme to flood the market to remain in compliance with the Company's debt covenants, which required, among other things, Scotts sales personnel to pressure retailers to purchase excess inventory that retailers did not need, and that the Company was dangerously close to breaching its debt covenants and would require a "exceptional year" to remain in compliance with the debt covenants.[10] Such falsities were included and/or omitted in the Company's proxy solicitations filed with the SEC during the Relevant Period, two of which solicited and received shareholder approval

---

[10] Scotts, to maintain compliance with its debt covenants, even modified the definition of how the Company calculated EBITDA in the fiscal fourth quarter of 2022. Scotts' fiscal year runs from October 1 – September 30.

to amend the lucrative incentive plan that materially benefitted the Individual Defendants, among others, at the Company, based on false pretenses, including Scotts actual financial performance and standing.

133. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by twice seeking shareholder approval of amendments to increase the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

134. Additionally, in breach of their fiduciary duties, the Individual Defendants caused

the Company to fail to maintain adequate internal controls.

135.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Scotts to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between October 2021 and July 2023, approximately 1,042,462 shares of Scotts common stock were repurchased, costing the Company **over $160.5 million**. As the Company's stock was actually worth only $57.86 per share, the price at which it was trading when markets closed on August 2, 2023, the Company overpaid for repurchases of its own stock **by over $100.2 million** in total.

136.    Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining proceeds of over $11,191,662. Additionally, the Company's largest shareholder, the Hagedorn Partnership, engaged in lucrative insider sales of Company common stock at artificially inflated prices, obtaining proceeds of over $5,886,450.

### **False and Misleading Statements**

#### *November 3, 2021 Earnings Call*

137.    On November 3, 2021, the Company held an earnings conference call with investors and analysts to discuss Scotts financial outcomes for the fourth quarter and full year of the 2021 Fiscal Year. During the call, Defendant Hagedorn stated, "we see a higher level of sustainable growth with our existing brands . . . based largely on our ability to reach a new generation of consumers." Additionally, Defendant Hagedorn highlighted that the Company "just finished [its] third straight record year and remain extremely optimistic." Lastly, he stated "every cut of the data tells us [consumers] have stayed with the category and our brands throughout this past season." The CFO at the time, Defendant Miller, built on Defendant Hagedorn's statements

by affirming that "as it relates to inventory, we find ourselves in a very good place right now."

### December 15, 2021 Proxy Statement

138.     On December 15, 2021, the Company filed the 2022 Proxy Statement. Defendants Hagedorn, Evans, Finn, Hanft, Johnson, Kelly, Littlefield, Mistretta, and Volas solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

139.     The 2022 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) reelect Defendants Evans, Hanft, Johnson, and Littlefield to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of Deloitte & Touche LLP ("Deloitte") as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (4) approve an amendment to the Incentive Plan to increase the number of common shares available under the Incentive Plan by 1,500,000 (the "2022 Amendment to the Incentive Plan"). As disclosed in the 2022 Proxy Statement, as of the date of the solicitation, there were 1,392,894 shares of common stock remaining to be issued under the Incentive Plan.

140.     The purpose of the Incentive Plan was to "be used to recruit new individuals to become employees or serve as directors or third-party service providers and for incentive purposes . . . ."

141.     The 2022 Proxy Statement noted that if the Scotts shareholders approved the 2022 Amendment to the Incentive Plan, "the maximum aggregate number of common shares that may be issued with respect to grants made on and after January 24, 2022 will be equal to the sum of" 1,500,000 "new common shares plus 1,392,894 common shares, which is the number of common shares that remained available for awards under the Plan as of December 1, 2021…"

142.     The Individual Defendants received lucrative compensation, while numerous of

them made false and misleading statements, during and after the solicitation of the 2022 Proxy Statement. Shareholders would not have approved the proposals in the 2022 Proxy Statement, and thus, the 2022 Amendment to the Incentive Plan, had they known the truth about Scotts. In total to date, the Company has awarded the following awards of common stocks to the Individual Defendants pursuant to the 2022 Amendment to the Incentive Plan as a result of shareholders approving the 2022 Amendment to the Incentive Plan under false pretenses:

### AMOUNTS RECEIVED UNDER THE 2022 AMENDMENT TO THE INCENTIVE PLAN

| Individual | Date | Shares of Common Stock/ Stock Options Awarded | Price Per Share |
|---|---|---|---|
| **James Hagedorn**, defendant, CEO, President & Chairman of the Board | 02/04/2022 | 22,579 | $132.87 |
| | **TOTAL Common Stock:** | **22,579** | **$3,000,072**[11] |
| | 11/4/2022 | 200,507 options | right to purchase at $50.40 per share |
| | **TOTAL Stock Options:** | **200,507 options** | right to purchase at $50.40 per share |
| **Matthew E. Garth**, defendant, EVP & CFO | 12/1/2022 | 13,580 | $55.23 |
| | **TOTAL Common Stock:** | **13,580** | **$750,023**[12] |
| **Christopher J. Hagedorn**, defendant, Division President | 02/04/2022 | 3,764 | $132.87 |
| | **TOTAL Common** | **3,764** | **$500,123**[13] |

[11] Grant date fair value of stock awards as represented on page 43 of the 2022 Proxy Statement, rounded to the nearest whole dollar: "the grant date fair value of each RSU and PU award was determined using the value of the underlying Common Shares on the date of grant, February 4, 2022, and was calculated in accordance with the equity compensation accounting provisions of FASB ASC Topic 718, without respect to forfeiture assumptions."

[12] Grant date fair value of stock awards

[13] *See* footnote 11.

| | Stock: | | |
|---|---|---|---|
| **David C. Evans**, defendant, Director, Former Interim CFO | **02/04/2022** | 1,581 | $132.87 |
| | **09/01/2022** | 17,181 | $62.57 |
| | **TOTAL Common Stock:** | **18,762** | **$1,285,082** |
| **Cory J. Miller**, defendant, Former CFO | **02/04/2022** | 4,516 | $132.87 |
| | **TOTAL Common Stock:** | **4,516** | **$600,041** |
| **Brian D. Finn**, defendant, Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067**[14] |
| **Adam Hanft**, defendant, Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067** |
| **Stephen L. Johnson**, defendant, Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067** |
| **Thomas N. Kelly Jr.**, defendant, Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067** |
| **Katherine Hagedorn Littlefield**, defendant, Director, Vice Chair | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067** |
| **Nancy G. Mistretta**, defendant, Former Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common** | **1,581** | **$210,067** |

---

[14] *See* page 21 of the 2022 Proxy Statement: "Reflects the aggregate grant date fair value of RSUs granted during the 2022 fiscal year. The grant date fair value of each RSU, except for Governor Sandoval, was determined using the value of the underlying Common Shares on the date of grant, February 4, 2022, and was calculated in accordance with the equity compensation accounting provisions of FASB ASC Topic 71".

| | Stock: | | |
|---|---|---|---|
| **Brian E. Sandoval**, Director | **06/10/2022** | 1,363 | $89.88 |
| | **TOTAL Common Stock:** | **1,363** | **$122,506**[15] |
| **Peter E. Shumlin**, Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067** |
| **John R. Vines**, Director | **02/04/2022** | 1,844 | $132.87 |
| | **TOTAL Common Stock:** | **1,844** | **$245,012** |
| **Geral Volas**, defendant, Director | **02/04/2022** | 1,581 | $132.87 |
| | **TOTAL Common Stock:** | **1,581** | **$210,067** |

143.    Regarding the "Board Role in Risk Oversight," the 2022 Proxy Statement stated

the following, in relevant part:

It is management's responsibility to develop and implement the Company's strategic plans and to identify, evaluate, manage and mitigate the risks inherent in those plans. It is the Board's responsibility to oversee the Company's strategic plans and to ensure that management is taking appropriate action to identify, evaluate, manage and mitigate the associated risks. The Board administers its risk oversight responsibilities both through active review and discussion of enterprise-wide risks and by delegating certain risk oversight responsibilities to Board committees for further consideration and evaluation. The decision to administer the Board's oversight responsibilities in this manner significantly impacts the Board's leadership and committee structure.

Because the roles of Chairman of the Board and CEO are combined, the directors annually elect a Lead Independent Director to enhance oversight of management and the potential risks facing the Company. In addition, the Board is comprised of predominantly independent directors and all members of the Board's key committees — the Audit Committee, the Compensation Committee, and the Governance Committee — are independent. The checks and balances provided by

---

[15] *See* page 21 of the 2022 Proxy Statement: "For Governor Sandoval, the grant date fair value of each RSU was determined using the value of the underlying Common Shares on the date of grant, June 10, 2022, and was calculated in accordance with the equity compensation accounting provisions of FASB ASC Topic 718, without respect to forfeiture assumptions."

our leadership structure help to ensure that key decisions made by the Company's senior management, up to and including the CEO, are reviewed and overseen by independent directors of the Board.

In some cases, risk oversight is addressed by the full Board as part of its engagement with the CEO and other members of senior management. For example, the full Board conducts a comprehensive annual review of the Company's overall strategic plan and the plans for each of the Company's business units, including associated risks. In connection with the Board's risk oversight responsibilities, management periodically provides the Board with reports regarding the significant risks facing the Company and how the Company is seeking to control or mitigate those risks. The Board also has responsibility for ensuring that the Company maintains appropriate succession plans for its senior officers and conducts an annual review of succession planning.

In other cases, the Board has delegated risk management oversight responsibilities to certain committees, each of which reports regularly to the full Board. For example, the Audit Committee oversees the Company's compliance with legal and regulatory requirements and its overall risk management process and has oversight responsibility for financial risks. As part of its oversight role, the Audit Committee regularly reviews risks relating to the Company's key accounting policies and receives reports regarding the Company's most significant internal controls and compliance risks from the Company's Chief Financial Officer as well as its internal auditors. Representatives of the Company's independent registered public accounting firm attend each Audit Committee meeting, regularly make presentations to the Audit Committee, and comment on management presentations. In addition, the Company's Chief Financial Officer and internal auditors, as well as representatives of the Company's independent registered public accounting firm, individually meet in private session with the Audit Committee on a regular basis, affording ample opportunity to raise any concerns with respect to the Company's risk management practices.

144. Regarding the Code of Conduct, the 2022 Proxy Statement stated the following,

in relevant part:

All employees of the Company and its subsidiaries, including each NEO, and all directors of the Company are required to comply with the Company's Code of Business Conduct and Ethics. The Sarbanes-Oxley Act of 2002 and the SEC Rules promulgated thereunder require companies to have procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters and to allow for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. The procedures for addressing these matters are set forth in the Company's Code of Business Conduct and Ethics.

145.    Defendants Hagedorn, Evans, Finn, Hanft, Johnson, Kelly, Littlefield, Mistretta, and Volas caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2022 Amendment to the Incentive Plan; and (6) the Company failed to maintain internal controls.

146.    The 2022 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

147.    As a result of the shareholders approving the 2022 Amendment to the Incentive Plan, there were 2,892,894 shares available for issuance under the Incentive Plan after the 2022 Proxy Statement. According to the 2023 Proxy Statement, as of December 1, 2022, only 714,859

shares were left available under the Incentive Plan – disclosing that 2,178,035 shares were already paid out to officers and directors of the Company between January 24, 2022, the day that the shareholders approved the 2022 Amendment to the Incentive Plan, and December 1, 2022, which constituted 785,141 shares more than the pre-vote remaining amount of 1,392,894 shares. As such, the Individual Defendants, including many who are currently directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading the 2022 Proxy Statement and the shareholders approving the 2022 Amendment to the Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Incentive Plan.

### *May 3, 2022 Earnings Call*

148.     On May 3, 2022, the Company held an earnings conference call with investors and analysts to discuss Scotts' financial outcomes for the second quarter of the 2022 Fiscal Year ended on April 2, 2022. On this call, Defendant Hagedorn stated that "the lack of capacity in the short term meant we also had to build and hold more inventory to ensure we could service the needs of our retail partners." Nevertheless, he also reassured investors that the Company was "tracking to do even better," and that weather was Scotts' "biggest challenge" when dealing with moving inventory. Additionally, Defendant C. Hagedorn added that even though there was an excess in inventories, "peak selling is happening now."

### <u>The Truth Begins To Emerge As False And Misleading Statements Continue</u>

### *June 8, 2022 Earnings Call*

149.     The truth began to emerge on June 8, 2022, when the Company published a press release confessing that refill orders from U.S. retailers for the month of May were more than $300

million below target and that Scotts would have to chop its 2022 full-year earnings guidance in half. The press release further revealed that Scotts was preparing to take on additional debt to cover restructuring charges that were put in place to cut costs further.

150. The market was dismayed by the disclosure. A Truist report declared that "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]."

151. On this news, the price of the Company's common stock fell $9.05 per share, or approximately 9%, from a closing price of $102.18 per share on June 7, 2022 to a closing price of $93.13 per share on June 8, 2022. Yet, the Individual Defendants continued to obfuscate the truth about Scotts' inventory saturation and debt covenant compliance problems.

### *August 3, 2022 Earnings Call*

152. On August 3, 2022, the Company held an earnings conference call with its investors and analysts to announce the Company's financial outcomes for the third quarter of the 2022 Fiscal Year ended on July 2, 2022. The CFO during this time, Defendant Miller, told investors that any issues the Company had selling its inventory, and products was mainly caused by "every unit just costing more."

### *November 2, 2022 Press Release*

153. On November 2, 2022, before the market opened, Scotts filed a current report on Form 8-K that contained the same press release published that day, announcing its financial outcomes for the fourth quarter of the 2022 Fiscal Year. The press release stated, in relevant part:

> [b]eginning with the three months ended September 30, 2022, equity in income / loss of unconsolidated affiliates is excluded from the calculation of non-GAAP Adjusted EBITDA. This exclusion is consistent with the calculation of that measure as required by the Company's borrowing arrangements. This change has been reflected in the calculation of Adjusted EBITDA for the three and twelve months ended September 30, 2022. The prior period amounts have not been reclassified to conform to the revised calculation.

### November 2, 2022 Earnings Call

154.    On the same day, the Company held an earnings call with its investors and analysts to examine the Company's financial outcomes for the fourth quarter of the 2022 Fiscal Year and the full year. During the call, an analyst inquired about the Company's plan to sustain its leverage ratio and about its EBITDA growth to remain in compliance with the debt covenants. Interim CFO at this time, Defendant Evans, responded, "I can just tell you that the EBITDA growth that we have built in our plan is, today, I mean, we're not presenting a plan that says we're going to be in default. I mean, we're presenting a plan that says we will be in compliance. Moreover, on this same call, Defendant Hagedorn asserted, "I'm optimistic we will remain within the bounds of our bank covenants."

### December 14, 2022 Proxy Statement

155.    On December 14, 2022, the Company filed the 2023 Proxy Statement with the SEC. Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, Littlefield, Mistretta and Volas solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

156.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) reelect Defendants Hagedorn, Mistretta, and Volas and elect non-party Edith Aviles to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (4) approve an amendment to the Incentive Plan to increase the number of common shares available under the Incentive Plan by 2,300,000 (the "2023 Amendment to the Incentive Plan"). As disclosed in the 2023 Proxy Statement, as of the date of the solicitation, there were 714,859 shares of common stock remaining to be issued under the Incentive Plan.

157.     The 2023 Proxy Statement noted that if the Scotts shareholders approved the 2023 Amendment to the Incentive Plan, "the maximum aggregate number of common shares that may be issued with respect to grants made on and after January 23, 2023 will be equal to the sum of" 2,300,000 "new common shares, plus 714,859 common shares, which is the number of common shares that remained available for awards under the Plan as of December 1, 2022…"

158.     The Individual Defendants received lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the 2023 Proxy Statement. Shareholders would not have approved the proposals in the 2023 Proxy Statement, and thus, the 2023 Amendment to the Incentive Plan, had they known the truth about Scotts. In total to date, the Company has awarded the following awards of common stocks to the Individual Defendant pursuant to the 2023 Amendment to the Incentive Plan as a result of shareholders approving the 2023 Amendment to the Incentive Plan under false pretenses:

## AMOUNTS RECEIVED UNDER THE 2023 AMENDMENT TO THE INCENTIVE PLAN

| Individual | Date | Common Stock/Stock Options Awarded | Price Per Share |
|---|---|---|---|
| **James Hagedorn**, defendant, CEO, President & Chairman of the Board | | 43,759 | $82.27 |
| | **TOTAL Common Stock:** | **43,759** | **$3,600,053** |
| **David C. Evans**, defendant, Director, Former Interim CFO | **02/03/2023** | 3,951 | $82.27 |
| | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| **Matthew E. Garth,** defendant, CFO | **02/03/2023** | 10,940 | $82.27 |
| | **TOTAL Common Stock:** | **10,940** | **$900,034** |

|  | 02/03/2023 | 28,599 options | right to purchase at $82.27 per share |
|---|---|---|---|
|  | **TOTAL Stock Options:** | **28,599 options** | right to purchase at $82.27 per share |
| *Edith Avilés*, Director | 02/03/2023 | 3,951 | $82.27 |
|  | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| *Adam Hanft*, defendant, Director | 02/03/2023 | 3,951 | $82.27 |
|  | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| *Stephen L. Johnson*, defendant, Director | 02/03/2023 | 3,951 | $82.27 |
|  | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| *Thomas N. Kelly Jr.*, defendant, Director | 02/03/2023 | 3,591 | $82.27 |
|  | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| *Nancy G. Mistretta*, defendant, Former Director | 02/03/2023 | 3,591 | $82.27 |
|  | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| *Mark D. Kingdon*, Director | 07/13/2023 | 1,497 | $70.17 |
|  | **TOTAL Common Stock:** | **1,497** | **$105,044** |
| *Peter E. Shumlin*, Director | 02/03/2023 | 3,951 | $82.27 |
|  | **TOTAL Common Stock:** | **3,951** | **$325,049** |
| *John R. Vines*, Director | 02/03/2023 | 4,559 | $82.27 |
|  | **TOTAL Common Stock:** | **4,559** | **$375,233**[16] |

[16] Per the 2023 Proxy Statement, this amount includes "an additional grant of $50,000 in Standard RSUs for General Vines' service as the Company's Lead Independent Director from January 1, 2023 through November 3, 2023, and was not otherwise reduced given the length of time he served in the role."

| *Geral Volas*, defendant, Director | 02/03/2023 | 3,951 | $82.27 |
|---|---|---|---|
| | **TOTAL Common Stock:** | **3,951** | **$325,049** |

159.     Regarding the "Board Role in Risk Oversight," the 2023 Proxy Statement stated

the following, in relevant part:

> It is management's responsibility to develop and implement the Company's strategic plans and to identify, evaluate, manage and mitigate the risks inherent in those plans. It is the Board's responsibility to oversee the Company's strategic plans and to ensure that management is taking appropriate action to identify, evaluate, manage and mitigate the associated risks. The Board administers its risk oversight responsibilities both through active review and discussion of enterprise-wide risks and by delegating certain risk oversight responsibilities to Board committees for further consideration and evaluation. The decision to administer the Board's oversight responsibilities in this manner significantly impacts the Board's leadership and committee structure.

> As the roles of Chairman of the Board and CEO are combined, the directors annually elect a Lead Independent Director to enhance oversight of management and the potential risks facing the Company. In addition, the Board is comprised of predominantly independent directors and all members of the Board's required committees — the Audit Committee, the Compensation Committee, and the Governance Committee — are independent. The checks and balances provided by our leadership structure help to ensure that key decisions made by the Company's senior management, up to and including the CEO, are reviewed and overseen by independent directors of the Board.

> In some cases, risk oversight is addressed by the full Board as part of its engagement with the CEO and other members of senior management. For example, the full Board conducts a comprehensive annual review of the Company's overall strategic plan and the plans for each of the Company's business units, including associated risks. In connection with the Board's risk oversight responsibilities, management periodically provides the Board with reports regarding the significant risks facing the Company and how the Company is seeking to control or mitigate those risks. The Board also has responsibility for ensuring that the Company maintains appropriate succession plans for its senior officers and conducts an annual review of succession planning.

> In other cases, the Board has delegated risk management oversight responsibilities to certain committees, each of which reports regularly to the full Board.

160.     Regarding the Code of Conduct, the 2023 Proxy Statement stated the following,

in relevant part:

> All employees of the Company and its subsidiaries, including each NEO, and all directors of the Company are required to comply with the Company's Code of Business Conduct and Ethics. The Sarbanes-Oxley Act of 2002 and the SEC Rules promulgated thereunder require companies to have procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters and to allow for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. The procedures for addressing these matters are set forth in the Company's Code of Business Conduct and Ethics.

161. Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, Littlefield, Mistretta and Volas caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Amendment to the Incentive Plan; and (6) the Company failed to maintain internal controls.

162. The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code

58

of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

163.     As a result of the shareholders approving the 2023 Amendment to the Incentive Plan, there were 3,014,859 shares available for issuance under the Incentive Plan after the 2023 Proxy Statement. According to the 2024 Proxy Statement, as of November 27, 2023, only 1,820,961 shares were left available under the Incentive Plan – disclosing that 1,193,898 shares were already paid out to officers and directors of the Company between January 23, 2023, the day that the shareholders approved the 2023 Amendment to the Incentive Plan, and November 27, 2023, the record date of the 2024 Proxy Statement, which constituted 479,039 shares more than the pre-vote remaining amount of 714,859 shares. For the Individual Defendants, including many who are currently directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the 2023 Amendment to the Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Incentive Plan.

### *February 1, 2023 Earnings Call*

164.     On February 1, 2023, the Company held an earnings conference call with investors and analysts to discuss the Company's financial outcomes for the first quarter of the 2023 Fiscal Year ended on December 31, 2022. Defendant Hagedorn presented the financial results of the Company as "against [the Company's] internal targets." Specifically, he indicated "[n]et sales that beat the plan by nearly $25 million; gross margin improvement of almost 300 basis points

against our plan; EBITDA of $21 million against an internal forecast of zero; net leverage of 5.9 times debt-to-EBITDA comfortably within the covenant maximum of 6.25 times."

165.    Additionally, during the call, Defendant Hagedorn reassured investors, "I don't think we have a[n] inventory problem at all." Current CFO, Defendant Garth, also pushed that the Company had "record December shipments."

### *March 6, 2023 Raymond James Institutional Investors Conference*

166.    On March 6, 2023, Scotts was invited to present at the Raymond James Institutional Investors Conference. During the conference, Defendant Garth announced to investors that the "[f]irst quarter proved that we were able to stay within out covenant 5.9 times against the 6.25 covenant." Additionally, Defendant Garth continued to represent that the Company had "record December shipments."

### *May 3, 2023 Earnings Call*

167.    On May 3, 2023, the Company held an earnings conference call with investors and analysts to announce the Company's financial outcomes for the second quarter of the 2023 Fiscal Year ended on April 1, 2023. Defendant Garth stated to investors that the "lower shipment volumes are related to our expectation for reduced retail inventory levels." Additionally, he represented that "we've pulled back on production volumes and we are selling through higher cost inventory."

168.    On this same call, Defendant Hagedorn relayed that the Company "do[es] not see leverage compliance issues going forward as [it's] looking at the low-5 times range by fiscal year end." Moreover, he continued by stating the "team on consumer has just really killed it, "which was "really, really important for us to avoid covenant hell" for the first half of the 2023 Fiscal Year.

169.    The statements in paragraphs ¶¶137, 148, 152-154, and 164-168 above were

materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by twice seeking shareholder approval of amendments to increase the number of shares available under the Incentive Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH FULLY EMERGES

### *August 2, 2023 Press Release*

170.     The truth fully emerged on August 2, 2023, when the Company published a press release revealing its financial outcomes for the third quarter of the 2023 Fiscal Year. Along with the press release, the Company filed a current report on Form 8-K which disclosed that Scotts amended its debt covenants. Specifically, the disclosure revealed that Scotts had to change its debt

covenants to permit a 7.00 times debt-to-EBITDA ratio, from the original ratio of 6.25 times debt-to-EBITDA ratio.

*August 2, 2023 Earnings Call*

171.     Additionally, that same day, Scotts held an earnings conference call to discuss the Company's financial performance for the third quarter of the 2023 Fiscal Year. During the call, the Individual Defendants revealed that sales fell by 6%, that gross margins decreased by 420 basis points, that the Company had slashed its fiscal year EBITDA guidance by a massive 25%, and that Scotts had to write down $20 million for "pandemic driven excess inventories."

172.     On this news, the price of the Company's common stock fell $13.58 per share, or approximately 19%, from a closing market price of $71.44 per share on August 1, 2023, to close at $57.86 per share on August 2, 2023.

## REPURCHASES DURING THE RELEVANT PERIOD

173.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $160,566,729.79*** to repurchase approximately 1,042,462 shares of its own common stock at artificially inflated prices between October 2021 and July 2023.

174.     According to the Form 10-Q filed with the SEC on February 9, 2022 (the "2022 1Q 10-Q"), between October 31, 2021 and November 27, 2021, the Company repurchased 521,406 shares of its own common stock at an average price per share of approximately $168.53, for a total cost to the Company of approximately $87,872,553.18. [17]

175.     As the Company's stock was actually worth only $57.86 per share, the price at

---

[17] Upon information and belief, these shares were repurchased during the Relevant Period.

closing on August 2, 2023, the Company overpaid by approximately $57,704,002.02 for repurchases of its own stock between October 31, 2021 and November 27, 2021.

176. According the 2022 1Q 10-Q, between November 28, 2021 and January 1, 2022, the Company repurchased 134,685 shares of its own common stock at an average price per share of approximately $152.64, for a total cost to the Company of approximately $20,558,318.40.

177. As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $12,765,444.30 for repurchases of its own stock between November 28, 2021 and January 1, 2022.

178. According to the Form 10-Q filed with the SEC on May 11, 2022 (the "2022 2Q 10-Q"), between January 2, 2022 and January 29, 2022, the Company repurchased 97,009 shares of its own common stock at an average price per share of approximately $157.71, for a total cost to the Company of approximately $15,299,289.39.

179. As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $9,686,348.65 for repurchases of its own stock between January 2, 2022 and January 29, 2022.

180. According to the 2022 2Q 10-Q, between January 30, 2022 and February 26, 2022, the Company repurchased 109,671 shares of its own common stock at an average price per share of approximately $138.62, for a total cost to the Company of approximately $15,202,594.02.

181. As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $8,857,029.96 for repurchases of its own stock between January 30, 2022, and February 26, 2022.

182. According to the 2022 2Q 10-Q, between February 27, 2022 and April 2, 2022, the Company repurchased 159,710 shares of its own common stock at an average price per share

of approximately $126.34, for a total cost to the Company of approximately $20,177,761.40.

183.    As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $10,936,940.80 for repurchases of its own stock between February 27, 2022 and April 2, 2022.

184.    According to the Form 10-Q filed with the SEC on August 10, 2022 (the "2022 3Q 10-Q"), between April 3, 2022 and April 30, 2022, the Company repurchased 946 shares of its own common stock at an average price per share of approximately $104.04, for a total cost to the Company of approximately $98,421.84.

185.    As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $43,686.28 for repurchases of its own stock between April 3, 2022 and April 30, 2022.

186.    According to the 2022 3Q 10-Q, between May 1, 2022 and May 28, 2022, the Company repurchased 1,087 shares of its own common stock at an average price per share of approximately $96.05, for a total cost to the Company of approximately $104,406.35.

187.    As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $41,512.53 for repurchases of its own stock between May 1, 2022 and May 28, 2022.

188.    According to the 2022 3Q 10-Q, between May 29, 2022 and July 2, 2022, the Company repurchased 2,569 shares of its own common stock at an average price per share of approximately $87.99, for a total cost to the Company of approximately $226,046.31.

189.    As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $77,403.97 for repurchases of its own stock between May 29, 2022 and July 2, 2022.

190.　　According to the Form 10-K filed with the SEC on November 28, 2022 (the "2022 10-K), between July 3, 2022 and July 30, 2022, the Company repurchased 1,255 shares of its own common stock at an average price per share of approximately \$82.53, for a total cost to the Company of approximately \$103,575.15.

191.　　As the Company's stock was actually worth only \$57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately \$30,960.85 for repurchases of its own stock between July 3, 2022 and July 30, 2022.

192.　　According to the 2022 10-K, between July 31, 2022 and August 27, 2022, the Company repurchased 1,389 shares of its own common stock at an average price per share of approximately \$72.93, for a total cost to the Company of approximately \$101,299.77.

193.　　As the Company's stock was actually worth only \$57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately \$20,932.23 for repurchases of its own stock between July 31, 2022, and August 27, 2022.

194.　　According to the 2022 10-K, between August 28, 2022 and September 30, 2022, the Company repurchased 2,308 shares of its own common stock at an average price per share of approximately \$58.33, for a total cost to the Company of approximately \$134,625.64.

195.　　As the Company's stock was actually worth only \$57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately \$1,084.76 for repurchases of its own stock between August 28, 2022, and September 30, 2022.

196.　　According to the Form 10-Q that was filed with the SEC on May 10, 2023 (the "2023 2Q 10-Q"), between January 1, 2023 and January 28, 2023, the Company repurchased 109 shares of its own common stock at an average price per share of approximately \$63.19, for a total cost to the Company of approximately \$6,887.71.

197.     As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $580.97 for repurchases of its own stock between January 1, 2023 and January 28, 2023.

198.     According to the 2023 2Q 10-Q, between February 26, 2023 and April 1, 2023, the Company repurchased 2,640 shares of its own common stock at an average price per share of approximately $72.52, for a total cost to the Company of approximately $191,452.80.

199.     As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $38,702.40 for repurchases of its own stock between February 26, 2023, and April 1, 2023.

200.     According to the Form 10-Q that was filed with the SEC on August 9, 2023 (the "2023 3Q 10-Q"), between April 2, 2023 and April 29, 2023, the Company repurchased 105 shares of its own common stock at an average price per share of approximately $65.68 for a total cost to the Company of approximately $6,896.40.

201.     As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $821.10 for repurchases of its own stock between April 2, 2023 and April 29, 2023.

202.     According to the 2023 3Q 10-Q, between April 30, 2023, and May 27, 2023, the Company repurchased 2,648 shares of its own common stock at an average price per share of approximately $65.53 for a total cost to the Company of approximately $173,523.44.

203.     As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $20,310.16 for repurchases of its own stock between April 30, 2023, and May 27, 2023.

204.     According to the 2023 3Q 10-Q, between May 28, 2023 and July 1, 2023, the

Company repurchased 3,634 shares of its own common stock at an average price per share of approximately $60.23 for a total cost to the Company of approximately $218,875.82.

205. As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $8,612.58 for repurchases of its own stock between May 28, 2023, and July 1, 2023.

206. According to the Form 10-K that was filed with the SEC on November 22, 2023, between July 2, 2023, and July 29, 2023, the Company repurchased 1,291 shares of its own common stock at an average price per share of approximately $69.87 for a total cost to the Company of approximately $90,202.71.

207. As the Company's stock was actually worth only $57.86 per share, the price at closing on August 2, 2023, the Company overpaid by approximately $15,504.91 for repurchases of its own stock between July 2, 2023, and July 29, 2023.

208. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***over $100,249,878.47***.

## **DAMAGES TO SCOTTS**

209. As a direct and proximate result of the Individual Defendants' conduct, Scotts has lost and will continue to lose and expend many millions of dollars.

210. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associate with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

211. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts

paid to outside lawyers, accountants, and investigators in connection thereto.

212. Such expenditures also include, but are not limited to, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

213. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

214. Such losses include the Company's overpayment of $100,249,878.74 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

215. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company including those received pursuant to the twice amended Incentive Plan.

216. As a direct and proximate result of the Individual Defendants' conduct, Scotts has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

217. Plaintiff brings this action derivatively and for the benefit of Scotts to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Scotts, unjust enrichment, abuse of control, gross

mismanagement, waste of corporate assets, and violations of the Exchange Act.

218.     Scotts is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

219.     Plaintiff is, and has been at all relevant times, a shareholder of Scotts. Plaintiff will adequately and fairly represent the interests of Scotts in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

220.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Scotts' Board consisted of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield (the "Director-Defendants"), along with nonparties Edith Avilés, Mark D. Kingdon, Brian E. Sandoval, Peter E. Shumlin, John R. Vines (collectively with the "Director-Defendants," the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was filed.

222.     Demand is excused as to all of the Director-Defendants and nonparties Edith Avilés, Mark D. Kingdon, Brian E. Sandoval, Peter E. Shumlin, and John R. Vines because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and

the other perpetrators of the scheme.

223.    The Director-Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, and nonparties Peter E. Shumlin and John R. Vines, solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Scotts.

224.    Furthermore, the Director-Defendants, that is, Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, nonparties Brian E. Sandoval, Peter E. Shumlin, John R. Vines, and Edith Avilés, solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves and elect Edith Avilés to the Board, thus allowing them to continue breaching their fiduciary duties to Scotts.

225.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Scotts to issue materially false and misleading statements. Specifically, the Director-Defendants caused Scotts to issue false and misleading statements which were intended to obscure Scotts' tax liabilities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

226.    Additional reasons that demand on Defendant Hagedorn is futile to follow. Defendant Hagedorn has served as the CEO of the Company since May 2001, Chairman of the Board since January 2003, and as President since October 2023. Additionally, he has served as a Company director since 1995 and was President from October 2015 until February 2016. Defendant Hagedorn is siblings with fellow board member and Vice Chair, Defendant Littlefield and a general partner of the Hagedorn Partnership, the Company's largest shareholder.

70

Furthermore, he solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Evans, Hanft, Johnson, Kelly, and Littlefield, and nonparties Peter E. Shumlin and John R. Vines, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Hagedorn with material personal benefits in the form of stock awards and stock options that he would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan.[18]

227.    In addition, Defendant Hagedorn also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Evans, Hanft, Johnson, Kelly, and Littlefield, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines, and the election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Defendant Hagedorn with material personal benefits in the form of stock awards and stock options that he would not have otherwise received

---

[18] Before the shareholders approved the 2022 Amendment to the Incentive Plan at the annual meeting of stockholders of Scotts on January 24, 2022, 1,392,894 shares remained available for future issuance under the Incentive Plan. After the shareholders approved the 2022 Amendment to the Incentive Plan, there were 2,892,894 shares available for issuance under the amended Incentive Plan. According to the 2023 Proxy Statement, as of December 1, 2022, only 714,859 shares were available under the amended Incentive Plan—disclosing that 2,178,035 shares were paid out to the officers and directors of the Company between the day that shareholders approved the 2022 Amendment to the Incentive Plan and December 1, 2022, which was 785,141 shares more than the pre-vote remaining amount of 1,392,894 shares. For this reason, the Individual Defendants, including the Director-Defendants, received material person benefits that they otherwise would not receive but for from the issuance of the false and misleading 2022 Proxy Statement and the shareholders approving the 2022 Amendment to the Incentive Plan that increased the number of shares available under the Incentive Plan.

had the shareholders not approved the 2023 Amendment to the Incentive Plan.[19] Furthermore, Defendant Hagedorn continues to receive handsome compensation from his role as director described above.

228. As the trusted longtime CEO, President, and Chairman of the Board, Defendant Hagedorn conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Furthermore, he engaged in lucrative insider trading through his personal holdings, obtaining personal profits of approximately $10,564,410 and through his holdings in the Hagedorn Partnership, obtaining profits of approximately $5,886,450. He is also a defendant in the Securities Class Action. For these reasons, Defendant Hagedorn faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

229. Additional reasons that demand on Defendant Evans is futile to follow. Defendant Evans has served as a Company director since 2018. He previously served as interim CFO from

---

[19] Before the shareholders approved the 2023 Amendment to the Incentive Plan at the annual meeting of stockholders of Scotts on January 23, 2023, 714,859 shares remained available for future issuance under the Incentive Plan. After the shareholders approved the 2023 Amendment to the Incentive Plan, there were 3,014,859 shares available for issuance under the amended Incentive Plan. According to the 2024 Proxy Statement, as of November 27, 2023, only 1,820,961 shares were available under the amended Incentive Plan—disclosing that 1,193,898 shares were paid out to the officers and directors of the Company between the day that shareholders approved the 2023 Amendment to the Incentive Plan and November 27, 2023, which was 479,039 shares more than the pre-vote remaining amount of 714,859 shares. For this reason, the Individual Defendants, including the Director-Defendants, received material person benefits that they otherwise would not receive but for from the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the 2023 Amendment to the Incentive Plan that increased the number of shares available under the Incentive Plan.

August 2022 to November 2022. Defendant Evans also serves as the Chair of the Audit Committee and as a member of the Finance Committee. In addition, he solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Hagedorn, Hanft, Johnson, Kelly, and Littlefield, and nonparties Peter E. Shumlin and John R. Vines, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Evans with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan.

230. In addition, Defendant Evans also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Hanft, Johnson, Kelly, and Littlefield, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Defendant Evans with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, Defendant Evans continues to receive handsome compensation for his role as director described above. As a trusted Company director, Defendant Evans conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to

protect corporate assets. In addition, during the Relevant Period, he failed to correct false and misleading statements alleged herein. Furthermore, he engaged in lucrative insider trading, obtaining personal profits of approximately $89,066. He is also a defendant in the Securities Class Action. For these reasons, Defendant Evans faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231. Additional reasons that demand on Defendant Hanft is futile to follow. Defendant Hanft has served as a Company director since 2010. He also serves as a member of both the Finance and Innovation and Technology Committees. Defendant Hanft solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Hagedorn, Evans, Johnson, Kelly, and Littlefield, and nonparties Peter E. Shumlin and John R. Vines, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Hanft with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan.

232. In addition, Defendant Hanft also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Johnson, Kelly, and Littlefield, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Defendant Hanft with material personal

benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, Defendant Hanft continues to receive handsome compensation for his role as director described above. As a trusted Company director, Defendant Hanft conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct false and misleading statements alleged herein. For these reasons, Defendant Hanft faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

233. Additional reasons that demand on Defendant Johnson is futile to follow. Defendant Johnson has served as a Company director since 2010. He also serves as Chair of the Governance Committee and as a member of both the Compensation and Innovation and Technology Committees. Defendant Johnson solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Hagedorn, Evans, Hanft, Kelly, and Littlefield, and nonparties Peter E. Shumlin and John R. Vines, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Johnson with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan.

234. In addition, Defendant Johnson also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants

Hagedorn, Evans, Hanft, Kelly, and Littlefield, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Defendant Johnson with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Furthermore, Defendant Johnson continues to receive handsome compensation for his role as director described above. As a trusted Company director, Defendant Johnson conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct false and misleading statements alleged herein. Furthermore, he engaged in lucrative insider trading, obtaining personal profits of approximately $538,186. For these reasons, Defendant Johnson faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

235. Additional reasons that demand on Defendant Kelly is futile to follow. Defendant Kelly has served as a Company director since 2006. He also serves as Chair of the Innovation and Technology Committee and serves as a member of both the Compensation and Finance Committees. Defendant Kelly solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, and Littlefield, and nonparties Peter E. Shumlin and John R. Vines to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused

shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Kelly with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan.

236. In addition, Defendant Kelly also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, and Littlefield, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Defendant Kelly with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, Defendant Kelly continues to receive handsome compensation for his role as director described above. As a trusted Company director, Defendant Kelly conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct false and misleading statements alleged herein. For these reasons, Defendant Kelly faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

237. Additional reasons that demand on Defendant Littlefield is futile to follow. Defendant Littlefield has served as a Company director since 2000 and Vice Chair since 2013. She

also serves as Chair of the Finance Committee and as a member of the Innovation and Technology Committee. Defendant Littlefield is siblings with CEO and Chairman Defendant Hagedorn and is a general partner of the Hagedorn Partnership, the Company's largest shareholder. Furthermore, she solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Hagedorn, Evans, Hanft, Johnson, and Kelly, and nonparties Peter E. Shumlin and John R. Vines, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Defendant Littlefield with material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of herself, Defendants Hagedorn, Evans, Hanft, Johnson, and Kelly, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines, and the election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Defendant Littlefield with material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, Defendant Littlefield continues to receive handsome compensation for her role as director described above.

238. As a trusted a Company director, Defendant Littlefield conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements

consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct false and misleading statements alleged herein. Furthermore, she engaged in lucrative insider trading through her holdings in the Hagedorn Partnership, obtaining profits of approximately $5,886,450. For these reasons, Defendant Littlefield faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

239. Additional reasons that demand on Edith Avilés is futile to follow. Edith Avilés has served as a Company director since January 23, 2023. She also serves as a member of both the Audit and Finance Committees. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the election of herself, the re-election of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, and nonparties Brian E. Sandoval, Peter E. Shumlin, and John R. Vines to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Edith Avilés with material personal benefits in the form of stock awards that she would not have otherwise received had the shareholders not approved the amendment to the Incentive Plan. Furthermore, Edith Avilés continues to receive handsome compensation for her role as director. As a trusted a Company director, Edith Avilés conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Edith Avilés faces a substantial likelihood of liability, it not independent or

disinterested, and thus demand upon her is futile and, therefore, excused.

240. Additional reasons that demand on Mark D. Kingdon is futile to follow. Mark D. Kingdon has served as a Company director since July 13, 2023. He also serves as a member of the Audit, Compensation and Finance Committees. Furthermore, Mark D. Kingdon continues to receive handsome compensation for her role as director. As a trusted a Company director, Mark D. Kingdon conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Mark D. Kingdon faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

241. Additional reasons that demand on Brian E. Sandoval is futile to follow. Brian E. Sandoval has served as a Company director since June 13, 2022. He also serves as Chair of the Compensation Committee and as a member of the Governance Committee. In addition, Brian E. Sandoval solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, nonparties Peter E. Shumlin and John R. Vines, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Brian E. Sandoval with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, Brian E. Sandoval continues to receive handsome compensation for his role as director. As a trusted a Company director, Brian E. Sandoval conducted little, if any oversight of

the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Brian E. Sandoval faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

242. Additional reasons that demand on Peter E. Shumlin is futile to follow. Peter E. Shumlin has served as a Company director since 2017 and Lead Independent Director since November 2023. He also serves as a member of both the Compensation and Governance Committees. Peter E. Shumlin solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, and nonparty John R. Vines to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing Peter E. Shumlin with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan.

243. In addition, Peter E. Shumlin also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, nonparties Brian E. Sandoval and John R. Vines, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing Peter E. Shumlin with material personal benefits in the form

of stock awards that he would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, Peter E. Shumlin continues to receive handsome compensation for his role as director. As a trusted a Company director, Peter E. Shumlin conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, he engaged in lucrative insider trading, obtaining personal profits of approximately $42,705. For these reasons, Peter E. Shumlin faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

244.     Additional reasons that demand on John R. Vines is futile to follow. John R. Vines has served as a Company director since 2013. He also serves as a member of both the Innovation and Technology and Governance Committees. John R. Vines solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, and nonparty Peter E. Shumlin to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2022 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 1,500,000, thereby providing John R. Vines with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2022 Amendment to the Incentive Plan.

245.     In addition, John R. Vines also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, nonparties Brian E. Sandoval and Peter

E. Shumlin, and election of nonparty Edith Avilés to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 Amendment to the Incentive Plan that increased the amount of shares available under the Incentive Plan by 2,300,000, thereby providing John R. Vines with material personal benefits in the form of stock awards that he would not have otherwise received had the shareholders not approved the 2023 Amendment to the Incentive Plan. Furthermore, John R. Vines continues to receive handsome compensation for his role as director. As a trusted a Company director, John R. Vines conducted little, if any oversight of the schemes to cause the Company to make false and misleading statements consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, John R. Vines faces a substantial likelihood of liability, it not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246.    Additional reasons that demand on the Board is futile follow.

247.    Defendant Mistretta, Evans, Kelly and Volas (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code

of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

248.     In violation of the Code of Conduct, the Directors engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Directors breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

249.     Scotts has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Scotts any part of the damages Scotts suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

250.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

251.    The acts complained of herein constitute violations of fiduciary duties owed by Scotts' officers and directors, and these acts are incapable of ratification.

252.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Scotts. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Scotts, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

253.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Scotts to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

254.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

255.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

256.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

257.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

258.    Under the direction and watch of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, the 2022 Proxy Statement failed to disclose: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

86

259. The 2022 Proxy Statement failed to disclose that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2022 Amendment to the Incentive Plan; and (6) the Company failed to maintain internal controls.

260. In exercise of reasonable care, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth shareholder determination in the 2022 Proxy Statement, including but not limited to the re-election of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield and the approval of the 2022 Amendment to the Incentive Plan.

261. The Company was damaged as a result of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield material misrepresentations and omissions in the 2022 Proxy Statement.

262. Under the direction and watch of Defendants Hagedorn, Evans, Hanft, Johnson,

Kelly, and Littlefield, the 2023 Proxy Statement failed to disclose: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

263.    The 2023 Proxy Statement failed to disclose that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2023 Amendment to the Incentive Plan; and (6) the Company failed to maintain internal controls.

264.    In exercise of reasonable care, Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth shareholder determination in the 2023 Proxy Statement, including but not limited to the

re-election of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield and the approval of the 2023 Amendment to the Incentive Plan.

265.    The Company was damaged as a result of Defendants Hagedorn, Evans, Hanft, Johnson, Kelly, and Littlefield material misrepresentations and omissions in the 2023 Proxy Statement.

266.    Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    The Individual Defendants, by virtue of their positions with Scotts and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Scotts and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Scotts to engage in the illegal conduct and practices complained herein.

269.    Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

270.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

271.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Scotts. Not only is Scotts now defending claims that it violated Section

10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Scotts by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *1,042,462* of its own shares at artificially inflated prices, damaging Scotts.

272.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

273.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Scotts not misleading.

274.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

275. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

276. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

277. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Scotts' business and affairs.

278. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

279. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Scotts.

280. Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Scotts' business, operations, and prospects. Specifically,

281. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

282. In breach of their fiduciary duties owed to Scotts, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) at the beginning of the Relevant Period, the Company had excess inventory on hand that significantly exceeded customer

91

demand and risked violating debt covenants by failing to meet EBITDA ratios; (2) the Company was very close to violating debt covenants and would of needed an "exceptional year" to remain in compliance with these covenants; (3) as a result, the Individual Defendants engaged in a scheme to flood the market with inventory by pressuring retailers to purchase more inventory than they needed or wanted so that the Company could remain compliant with its debt covenants; (4) in the fourth quarter of the 2022 Fiscal Year, the Individual Defendants caused Scotts to change how the Company calculated EBITDA so that the Company could remain compliant with its debt covenants; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of two amendments to the Incentive Plan; and (6) the Company failed to maintain internal controls.

283.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

284.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

285.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase more than a million shares of its own common stock at artificially inflated prices before the fraud was exposed.

286.    In yet further breach of fiduciary duties, during the Relevant period, Defendants Hagedorn, Littlefield, Evans, and Johnson engaged in insider sales of approximately $11,191,662, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Additionally, Hagedorn Partnership,

during the Relevant Period, also engaged in insider sales of approximately $5,886,450 while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

287. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

288. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

289. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Scotts has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

290. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Unjust Enrichment**

291. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

292. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Scotts.

293. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Scotts that was tied to the performance or artificially inflated valuation of Scotts, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

294. Plaintiff, as a shareholder and representative of Scotts, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

295. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

### SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

296. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Scotts, for which they are legally responsible.

298. As a direct and proximate result of the Individual Defendants' abuse of control, Scotts has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

299. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

### SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

300. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

301. By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Scotts in a manner consistent with the operations of a publicly held corporation.

302. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Scotts has sustained and will continue to sustain significant damages.

303. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

304. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

305. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

306. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

307. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

308. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

309. Plaintiff, on behalf of Scotts, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Hagedorn, C. Hagedorn, Garth, Evans and Miller for Contribution Under Sections 10(b) and 21D of the Exchange Act

310. Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

311. Scotts and Defendants Hagedorn, C. Hagedorn, Garth, Evans, and Miller are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Hagedorn, C. Hagedorn, Garth, Evans, and Miller's willful and/or reckless violations of their obligations as officers and/or directors Scotts.

312. Defendants Hagedorn, C. Hagedorn, Garth, Evans, and Miller, because of their positions of control and authority as officers and/or directors of Scotts, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Scotts, including the wrongful acts complained of herein and in the Securities Class Action.

313. As such, Scotts is entitled to receive all appropriate contribution or indemnification from Defendants Hagedorn, C. Hagedorn, Garth, Evans and Miller.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Scotts, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Scotts;

(c) Determining and awarding to Scotts the damages sustained by it as a result

96

of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

        (d)    Directing Scotts and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Scotts and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        2.  a provision to permit the shareholders of Scotts to nominate at least four candidates for election to the Board;

        3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

        (e)    Awarding Scotts restitution from the Individual Defendants, and each of them;

        (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 3, 2024

Respectfully submitted,

**EMPLOYMENT LAW PARTNERS, LLC**

/s/*David N. Truman*
David N. Truman (0082347)
Stuart G. Torch (0079667)
4700 Rockside Road, Suite 530
Independence, Ohio 44131
Telephone: (216) 382-2500
Fax: (216) 381-0250
david@employmentlawpartners.com
stuart@employmentlawpartners.com

*Local Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (New York Bar No. 4301495)
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Lead Counsel for Plaintiff*
*PRO HAC VICE ADMISSION ANTICIPATED*